# MOHEGAN TRIBE

v.

## STATE OF CONNECTICUT.

Civil No. H–77–434.

United States District Court, D. Connecticut.

Jan. 17, 1980.

Jerome M. Griner, West Hartford, Conn., for plaintiff.

Carl Ajello, Atty. Gen., Francis J. MacGregor, Asst. Atty. Gen., Hartford, Conn., for defendant.

David Roseman, Asst. Atty. Gen., Augusta, Maine, for amicus curiae.

RULING ON MOTION TO DISMISS

BLUMENFELD, District Judge.

This is a civil action for possession of land now allegedly owned and used by the State of Connecticut. The plaintiff, the Mohegan Tribe of Indians, claims that certain lands located in the northeast portion of the Town of Montville, Connecticut were "from time immemorial . . . until [the] defendant's predecessor-in-title . . . purported to claim title to the [land], exclusively owned, used, and occupied" by the Mohegans. It further claims that the property was held by the Tribe at the time of the enactment of the first Indian Trade and Intercourse Act in 1790. Act of July 22, 1790, ch. 33, 1 Stat. 137 ("1790 Act"). That Act and its successors provided, in part, that conveyances of Indian land to non-Indians would be invalid unless made by treaty under the authority of the United States.[1] Since the Indians held the land at the time of the Act and since no federal treaty has ever been made with them, they claim that the land is rightfully theirs.

Connecticut has filed a motion to dismiss this action. It bases its motion on a claim that the Trade and Intercourse Acts were not intended to apply to Indian tribes which were located to the east of the "Indian country" borderline. That borderline was defined for the first time in the 1834 enactment of the Trade and Intercourse Act,[2] but it is conceded that at no time between 1790 and the present have the Mohegans been residents of "Indian country." If, as the State contends, the Nonintercourse statute applied only in Indian country, the case should be dismissed.

▮ The current Nonintercourse statute, 25 U.S.C. § 177, and its predecessors, are all put in issue by the plaintiff's complaint and the defendant's answer. Since each reenactment of the Nonintercourse statute was primarily based on the language of the prior statute, however, the proper starting point for any inquiry lies in the original 1790 Act. It provided in pertinent part that:

> "no sale of lands made by any Indians, or any nation or tribe of Indians, *within the United States*, shall be valid to any person or persons, or to any state, whether having the right of pre-emption to such lands or not, unless the same shall be made and duly executed at some public treaty, held under the authority of the United States."

1790 Act, § 4 (emphasis added). The Act of March 1, 1793, ch. 19, 1 Stat. 329 ("1793 Act"), which supplanted the 1790 Act, provided:

> "That no purchase or grant of lands, or of any title or claim thereto, from any Indians, or nation or tribe of Indians, *within the bounds of the United States*, shall be of any validity in law or equity, unless the same be made by a treaty or convention entered into pursuant to the Constitution: . . . [I]t shall be lawful for the agent or agents of any State . . . under the authority of the United States, . . . to propose to, and adjust with the Indians, the compensation to be made for their claims to lands within such State . . . ."

1793 Act, § 8 (emphasis added). Because of a section in the 1793 Act which provided that the entire Act was to expire automatically after approximately two years,[3] the legislature reenacted the same Act in 1796.[4]

---

1. In this opinion, the court refers to the Indian land transfer provision, currently codified at 25 U.S.C. § 177, as the "Nonintercourse" statute. The Nonintercourse statute was always enacted along with other Indian statutes, the whole body of which will be referred to herein as the "Trade and Intercourse Act" or more simply as the "Act." While the Nonintercourse statute prohibited certain land transactions with Indians, the remaining provisions of the Trade and Intercourse Act swept more broadly. At differ-

ent times the Act has regulated trade in such diverse products as whiskey, guns, horses, and pots and pans, as well as jurisdiction for criminal prosecutions. It is currently codified in Titles 25 and 26 of the United States Code.

2. Act of June 30, 1834, ch. 161, § 1, 4 Stat. 729.

3. 1793 Act, § 15.

4. Act of May, 19, 1796, ch. 30, 1 Stat. 469 ("1796 Act").

With essentially the same language, the Act was again reenacted in 1799[5] and 1802.[6]

In 1834, the Nonintercourse statute took on the shape which it has had to the present day.[7] With only one relevant exception, the language of the section on land conveyances is identical to the language in the corresponding section of the 1793 Act. The only exception is the omission of the words "within the bounds of the United States." These words do not appear in the 1834 Act and since then no geographic limitation whatsoever has replaced them.

In spite of the fact that the Nonintercourse statute was enacted five times with the explicit words "within the United States" and still contains no explicit limitations, the defendant insists that the statute should be read as limited solely to "Indian country." Connecticut bases this claim on the legislative intent and history lying behind the Trade and Intercourse Act and on other sections of the Acts which do contain express geographic limitations.

Resolution of this motion only requires the court to construe the Nonintercourse statute. Arguments over the meaning of this short, three-sentence provision, however, have generated in excess of 300 pages of briefing, extensive research, and elaborate appendices. The arguments advanced by both parties can be grouped into three categories. Some are based on the language of the Acts themselves, some are based on their historical context, and others are based on prior case law. This opinion considers each of these three sets of arguments separately.

### The Language of The Act

In a case involving the interpretation of a statute, analysis must begin with the language of the statute itself. *Touche Ross & Co. v. Redington*, 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979). The language of the Trade and Intercourse Acts does not support the defendant's motion. In addition to the explicit references to "within the bounds of the United States" found in the land conveyance section, the language of several other sections in these Acts suggest that their application is not limited to Indian country.

For instance, from 1793 until 1834, every Act contained a "surrounded by settlements" provision.[8] Under this provision, the terms of the Act were not "[to] be construed to prevent any trade or intercourse with Indians living on lands surrounded by settlements of the citizens of the United States and being within the ordinary jurisdiction of any of the individual States . . . ."[9] At the time, there were no such surrounded Indians in the area defined as Indian country. If, as the

---

5. Act of March 3, 1799, ch. 46, 1 Stat. 743 ("1799 Act").

6. Act of March 30, 1802, ch. 13, 2 Stat. 139 ("1802 Act").

7. Act of June 30, 1834, ch. 161, § 12, 4 Stat. 729 ("1834 Act").

8. 1802 Act, § 19; 1799 Act, § 19; 1796 Act, § 19; 1793 Act, § 13.

9. Defendant has also advanced an argument based on these sections. Connecticut claims that by their express terms these sections exclude Indians surrounded by white citizens from the protection of the Trade and Intercourse Acts. Thus, since the Mohegan Tribe had been surrounded by white citizens since well before 1790, Connecticut argues, it never was entitled to the protection of the Nonintercourse statute.

The flaw in this argument, however, stems from reading the word "Indian" in these sec-

tions to include Indians living in tribal communities. As one court has recently stated:

> "At the time that this proviso was a part of the Act, the terms of the Act applied in land of 'any Indian' as well as to that of any 'nation or tribe of Indians.' The provision was repealed in 1834, . . . at the same time that transactions by individual Indians were removed completely from the coverage of the Act. . . . Thus the most logical interpretation of the proviso is the one which is also the most consistent with the rules of construction governing statutes relating to Indians . . . : the proviso was addressed to transactions by individual Indians living in 'white' settlements and has no application to land to which a *tribal* right of occupancy is claimed."

*Narragansett Tribe v. Southern Rhode Island Land Development Corp.*, 418 F.Supp. 798, 808–809 (D.R.I.1976).

defendant contends, the *entire* Trade and Intercourse Act was to apply only to Indian country, it would have served no purpose to *exempt* Indians living *outside* Indian country. It must be assumed that Congress knew what it was doing when it enacted the Act; this court is not inclined to give the Act an interpretation which will render portions of it meaningless. *Reiter v. Sonotone Corp.*, 442 U.S. 330, 344, 99 S.Ct. 2326, 2333, 60 L.Ed.2d 931 (1979); *Colautti v. Franklin*, 439 U.S. 379, 392, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979).

Another rule of statutory construction also lends support to the plaintiff's position. In 1802, Congress added section 21 to the Act, which provided:

"That the President of the United States be authorized to take such measures, . . . to prevent or restrain the vending or distributing of spirituous liquors *among all or any of the said Indian tribes*, . . . ." (Emphasis added).[10]

In 1822, however, Congress deemed it advisable to amend this section so as to limit its applicability to Indian country:

"That it shall and may be lawful for the President of the United States, in execution of the power vested in him by the *twenty-first section* of the act of the thirtieth of March, one thousand eight hundred and two, aforesaid, [the Trade and Intercourse Act] *to which this is an amendment,* to direct . . . [certain persons] to cause the stores and packages of goods of all traders to be searched, upon suspicion or information that *ardent spirits are carried into the Indian countries* by said traders *in violation of the twenty-first section of the act to which this is an amendment* . . . ." (Emphasis added).[11]

"It is a canon of statutory construction that where as here the words of a later statute differ from those of a previous one on the same or a related subject, the legislature must have intended them to have a different meaning." *Klein v. Republic Steel Corporation*, 435 F.2d 762, 765–766 (3d Cir. 1970). Thus, it seems unlikely that the 1822 amendment would have been necessary had the 1802 Act been entirely limited to Indian country. On the contrary, the logical conclusion to draw from this amendment is that when Congress wanted to limit the effect of a particular provision it was quite aware of how to do so.

In addition to these provisions, the specific provision concerning land transfer has a clue to its geographic applicability imbedded within it. Under the terms of every Act enacted after 1790, the "agents of States" were allowed to negotiate with Indians (under federal auspices) for claims to lands "within such States."[12] This makes it clear that the Nonintercourse statute was meant to apply within state boundaries. Defendant apparently concedes as much, but it points out that the boundary to Indian country ran through the western parts of some of the original 13 states. Thus, it claims that this proviso was meant to apply to land which was both in Indian country and within the boundaries of states. While this argument sustains the state's position for some of the earlier Acts, the 1834 Act, which contains the same proviso, expressly indicates that Indian country lies only outside of states.[13] It is therefore logically impossible to conclude both that the Act was meant to apply within the boundaries of a state, a conclusion mandated by the express language of the provision, and that the Act applied only to Indian country, a

---

10. 1802 Act, § 21.

11. Act of May 6, 1822, ch. 58, 3 Stat. 682.

12. 1834 Act, § 12; 1802 Act, § 12; 1799 Act, § 12; 1796 Act, § 12; 1793 Act, § 8.

13. "That all that part of the United States west of the Mississippi, and not within the States of Missouri and Louisiana, or the Territory of Arkansas and, also, that part of the United States east of the Mississippi river, and not within any

State to which Indian title has not been extinguished, for the purposes of this act, be taken and deemed to be the Indian country." 1834 Act, § 1.

In order better to understand the awkward language of this section, it is helpful to insert a comma following the phrase "and not within any State." Such an insertion is in accord with the intended meaning of the section.

conclusion drawn by the defendant. This, then, is further strong support for the plaintiff's position.

In opposition to these arguments, the defendant can muster only paltry support from the language of the Act. For instance, it argues that the title of the Act, "Act to Regulate Trade and Intercourse with Indian Tribes and to Preserve Peace on the Frontiers," suggests that the Act was solely designed to govern relations with frontier tribes. But, for whatever significance should be given to the title,[14] it is perhaps more accurate to say that it describes two objectives, only one of which dealt exclusively with frontier tribes. Moreover, the titles to the 1790 and 1793 Acts did not contain the "Peace on the Frontier" language upon which the defendants rely, even though they did include the restrictions on land conveyances at issue here.

Defendant also argues that the extensive delineation of a boundary line in the Act must signify that the entire Act was to apply only in the demarcated territory. Otherwise, Connecticut claims, the existence of a boundary line would be meaningless. The answer to this is obvious. Some sections of the Act expressly proscribed certain activities in "Indian country." For those sections, a definite boundary line was important. Other sections, not limited to Indian country by their terms, need not be given limited geographical applicability in order to ascribe meaning to the boundary line. It is no more persuasive to say that the mere existence of a boundary line in a statute means that all of the provisions of that statute are applicable only within the boundary, than it is to say that Congress' failure explicitly to limit the provisions of the entire Act to Indian country proves the contrary.

Finally, defendant argues that "boundary line" language found in the 1796–1802 Acts suggests that the entire Act was to be limited to Indian country. Defendant emphasizes the following closing proviso:

> "[I]f the boundary line between the said Indian tribes and the United States shall at any time hereafter, be varied, by any treaty . . . then *all the provisions* contained in this act shall be construed [so as] to apply to the said line so to be varied . . . ."[15]

Defendant would have the court ignore, however, the language obscured in the final ellipsis. The statute continues:

> ". . . in the same manner, as said provisions apply, by force of this act, to the boundary line hereinbefore recited."

In other words, where the boundary line as described in the Act is applicable to a particular provision, an amended boundary will also apply. If it suggests anything, however, the language tends to suggest that the "manner" in which the boundary line applies to various provisions may not be uniform section-to-section throughout the Act.

---

**14.** "[H]eading and title are not meant to take the place of the detailed provisions of the text. Nor are they necessarily designed to be a reference guide or a synopsis. Where the text is complicated and prolific, headings and titles can do no more than indicate the provisions in a most general manner; to attempt to refer to each specific provision would often be ungainly as well as useless. As a result, matters in the text which deviate from those falling within the general pattern are frequently unreflected in the headings and titles. Factors of this type have led to the wise rule that the title of a statute and the heading of a section cannot limit the plain meaning of the text. *United States v. Fisher*, 2 Cranch 358, 386 [2 L.Ed. 304]; *Cornell v. Coyne*, 192 U.S. 418, 430 [24 S.Ct. 383, 385, 48 L.Ed. 504]; *Strathearn S.S. Co. v. Dillon*, 252 U.S. 348, 354 [40 S.Ct. 350, 351, 64 L.Ed. 607]. For interpretative purposes, they are of use only when they shed light on some ambiguous word or phrase. They are but tools available for the resolution of a doubt. But they cannot undo or limit that which the text makes plain.

*Brotherhood of Railroad Trainmen v. Baltimore & Ohio R.R.*, 331 U.S. 519, 528–29, 67 S.Ct. 1387, 1392, 91 L.Ed. 1646 (1947). *See also United States v. Roemer*, 514 F.2d 1377, 1380 (2d Cir. 1975) ("[B]asic principle of statutory construction . . . gives precedence, in the event of irreconcilable conflict, to words in the body of a provision over those in the caption.").

**15.** 1802 Act, § 1; 1799 Act, § 1; 1796 Act, § 1 (emphasis added).

In short, the language of the Act—both that of the particular land conveyance section and that of the Act as a whole—does not support the defendant's position. On their face, the Trade and Intercourse Acts and the Nonintercourse statutes clearly apply everywhere "within the bounds of the United States," in Indian country and elsewhere.

*Legislative History and Historical Context*

 Because of the apparent clarity of the statutory language, plaintiff argues that reference to legislative history is inappropriate. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 201, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). As the Supreme Court has noted, however, " '[w]hen aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no "rule of law" which forbids its use, however clear the words may appear on "superficial examination." ' " *Train v. Colorado Public Interest Research Group*, 426 U.S. 1, 10, 96 S.Ct. 1938, 1942, 48 L.Ed.2d 434 (1976), *quoting United States v. American Trucking Ass'n*, 310 U.S. 534, 543–44, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940) (footnotes omitted). Ultimately, the objective of the court in construing a particular statute is to "ascertain the congressional intent and give effect to the legislative will," *Philbrook v. Glodgett*, 421 U.S. 707, 713, 95 S.Ct. 1893, 1898, 44 L.Ed.2d 525 (1975), and while legislative intent is best gleaned from the text of the statute itself, *AFL–CIO v. Marshall*, 187 U.S.App.D.C. 121, 127, 570 F.2d 1030, 1036 (D.C.Cir.1978); *Patagonia Corp. v. Board of Governors of Federal Reserve System*, 517 F.2d 803, 813 (9th Cir. 1975), the court should not be loathe to probe beneath the surface in its search for underlying intent.

Consequently, this court has gone beyond the language of the statute and has carefully examined the historical arguments advanced by the defendant. These arguments have been elaborately presented in meticulous briefs with extensive appendices and center on three general themes.[16] First, the defendant presents evidence which it claims shows that the Nonintercourse statutes were enacted merely as a continuation of the limited Indian act passed under the Articles of Confederation. Second, the defendant argues that the Acts were enacted solely to secure treaty rights and to preserve peace on the frontier; and finally, the defendant points to an extensive compilation of jurisdictional history which suggests that the executive branch of the government, throughout the 19th century, treated the Trade and Intercourse Acts as applicable solely to Indian country.

Both parties appear to concede that the Continental Congress, which operated under the Articles of Confederation, enacted a proclamation governing relations with Indians which explicitly left to the States the right to govern Indian affairs within their

---

**16.** In addition to arguments based on a more generalized history of Indian relations, the defendant has unearthed one fragment of "legislative history," as that term is generally used. In a report accompanying three bills, one of which dealt with the enactment of the 1834 Trade and Intercourse Act, the Committee of Indian Affairs of the House of Representatives stated that:

> "This bill is intended to apply to the whole Indian country . . . ; it will continue to embrace only those sections of country not within any State. . . ."

H.R.Rep.No.474, 23d Cong., 1st Sess. 10 (1834). While this quote has some probative value, its importance was minimized when, after the report was issued, an amendment offered by Senator Frelinghuysen was adopted on the floor of the Senate. Frelinghuysen, a bitter opponent of President Jackson's policy of removing Indian tribes to the west of the Mississippi, was able to insert a protective proviso in the 1834 Act. The proviso declared that the repeal of the 1802 Act by the 1834 enactment could not

> "impair or affect the intercourse act of eighteen hundred and two, so far as the same relates to or concerns Indian tribes residing east of the Mississippi."

1834 Act, § 29.

Apart from the quote discussed above, legislative history on the precise question before the court is not helpful. As the State of Maine, amicus curiae, has indicated:

> "Congressional debates and committee reports on the territorial applicability of the Acts are, admittedly, scanty."

boundaries.[17] In fact, the Continental Congress had no other choice, for the Articles of Confederation conferred no greater powers on it.[18] Both parties also agree that the Constitution, as it finally became effective in 1789, greatly expanded the powers of the government to deal with Indians.[19] The dispute between the parties arises over the extent to which Congress chose to exercise its new-found powers. Defendant argues that since the post-Constitution Congress was faced with the same problems and was composed of many of the same individuals as the Continental Congress, it only intended to exercise its powers to the same extent as they previously had been exercised. This, however, is hardly an automatic conclusion. A legislature constrained by an exceedingly weak grant of authority will not necessarily exhibit a similar degree of self-restraint when the external constraints are removed.[20] Nor is there such a similarity of language between the proclamation of the Continental Congress and the 1790 Act as would make the defendant's construction appear likely. The proclamation applied "without the limits or jurisdiction of any particular State," while the Nonintercourse statute of 1790 was expressly made applicable "within the United States." As the Court of Appeals for the First Circuit has noted in a slightly different context:

"[W]e find an inclusive reading consonant with the policy and purpose of the Act. That policy has been said to be to protect the Indian tribes' right of occupancy, even when that right is unrecognized by any treaty, *United States v. Santa Fe Pacific R. Co.*, 314 U.S. 339, 345, 347, 62 S.Ct. 248, 86 L.Ed. 260 (1941), *rehearing denied*, 314 U.S. 716, 62 S.Ct. 476, 86 L.Ed. 570 (1942), and the purpose to prevent the unfair, improvident, or improper disposition of Indian lands, *Federal Power Commission v. Tuscarora Indian Nation*, 362 U.S. 99, 119, 80 S.Ct. 543, 4 L.Ed.2d 584, *rehearing denied*, 362 U.S. 956, 80 S.Ct. 858, 4 L.Ed.2d 873 (1960); *United States v. Candelaria*, 271 U.S. 432, 441, 46 S.Ct. 561, 70 L.Ed. 1023 (1926). Since Indian lands have, historically, been of great concern to Congress, *see Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 667, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974), we have no difficulty in concluding that Congress intended to exercise its power fully."

*Joint Tribal Council of the Passamaquoddy Tribe v. Morton*, 528 F.2d 370, 377 (1st Cir. 1975).

Connecticut has also collected a vast array of historical writings and records which demonstrate that George Washington and Henry Knox, two of the primary architects

**17.** 1 Laws U.S. 607–608.

**18.** Articles of Confederation, Article IX.

**19.** U.S.Const., art. I, § 8, cl. 3 provides:
"The Congress shall have Power To . . . regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes . . . ."

**20.** In fact, several contemporaries suggested the contrary. When George Washington spoke to the Seneca tribe of New York Indians in 1790 he stressed to them that the United States Constitution and subsequent acts of Congress represented a significant change from the previous situation.

"I must inform you that these evils arose before the present Government of the United States was established, when the separate States, and individuals under their authority, undertook to treat with the Indian tribes respecting the sale of their lands. *But the case is now entirely altered*; the General Government, only, has the power to treat with the Indian nations, and any treaty formed, and held without its authority, will not be binding."
4 American State Papers 142 (1 Indian Affairs, 1832) (emphasis added).

Chief Justice Marshall put it more directly in his opinion for the Court in *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 559, 8 L.Ed. 483 (1832):
"The correct exposition of this article [in the Articles of Confederation] is rendered unnecessary by the adoption of our existing constitution. That instrument confers on congress the powers of war and peace; of making treaties, and of regulating commerce with foreign nations, and among the several states, and with the Indian tribes. These powers comprehend all that is required for the regulation of our intercourse with the Indians. They are not limited by any restrictions on their free actions; the shackles imposed on this power, in the confederation, are discarded."

of the Trade and Intercourse Acts, were principally concerned with placating the frontier Indians and minimizing friction on our young nation's western borders. This, of course, is undeniable, and the plaintiff does not contend otherwise. This court, however, finds it worthy of some note that in spite of the extensive research efforts by the defendant and the State of Maine, as amicus, neither have been able to unearth any writings which establish that peace on the frontier and the maintenance of treaty obligations were the *sole* objectives of the legislation.

It is particularly difficult to understand why there is no language from the sponsors of the Act designed to reassure individual states that their prerogatives in Indian affairs were not being changed, when the Act, on its face, appeared to sweep so broadly. The historical backdrop for the enactment of these Acts is dominated by conflicts between those who favored a strong central government and those who favored maintaining maximum state autonomy. Certainly, passage of the Acts would have been expedited had George Washington or other advocates of the measures been able to minimize the extent of "states-rights" opposition. Nonetheless, no such language has been brought to the court's attention.

Nor is it inconceivable that Washington's plan to preserve peace on the frontiers included concessions to Eastern Indians as some evidence of the United States' sincerity of purpose. As early as 1790, George Washington was addressing frontier tribes in an effort to convince them that the national approach to Indian affairs had changed.[21] Statutes which demonstrated a genuine intent to end the evils associated with encroachment on Indian land wherever situated would be substantial evidence of such a change.

Thus, while the history as presented by the defendant may have some probative value, it is not without ambiguity. The court is mindful of the principle that statutes are generally to be construed in light of the mischief to be remedied, *Liberation News Service v. Eastland*, 426 F.2d 1379, 1383 (2d Cir. 1970), but such an admonition is difficult to follow where the specific "mischief" is difficult to identify.

Finally, Connecticut and the State of Maine, as amicus, have developed an extensive argument based on "jurisdictional history." Jurisdictional history is a tool which is sometimes used to establish the meaning of a statute by determining which entities assert jurisdiction after a statute is enacted. While a history of such interaction is significant and lends some credence to the defendant's motion, extensive reliance on jurisdictional history under the circumstances in this case is inappropriate. Here, instead of a dispute where daily behavior can be said to have established a general understanding, this case involves a handful of land "sales" concluded over a hundred years ago. Neither the federal government's failure to intervene and declare the sales void nor the efforts of Connecticut to extinguish Indian title without federal approval in the late 18th or early 19th centuries can be said to have established the meaning of 25 U.S.C. § 177 and its predecessors.

In fact, one court recently faced with a claim under 25 U.S.C. § 177, a claim which was far more conducive to proof by jurisdictional history than is the claim in this case,[22] found that even virtually uninterrupted exercise of state jurisdiction could not alter the federal government's role as envisioned in the statute. In *Joint Tribal Council of the Passamaquoddy Tribe v.*

---

21. 4 American State Papers 142 (1 Indian Affairs, 1832) (Speech to Seneca Indians of New York).

22. In *Joint Tribal Council of the Passamaquoddy Tribe v. Morton*, 528 F.2d 370 (1st Cir. 1975), the issue was whether the United States had a "trust relationship" with the Passamaquoddy Indian tribe. The tribe claimed that the Nonintercourse statute created a fiduciary relationship. Unlike a handful of land sales, a trust "relationship" necessarily implies repeated and numerous contacts between the guardian and its ward, and would therefore appear to be more amenable to proof by jurisdictional history than is the claim advanced by the defendants here.

*Morton, supra,* the State of Maine placed before the First Circuit virtually the identical arguments it raises here as amicus in an effort to convince that court that the statute did not provide for a federal trust relationship with the Passamaquoddy Indian tribe. In spite of the fact that all of the jurisdictional history was to the contrary, the First Circuit concluded that the federal government's fiduciary status with respect to the protection of Indian lands was established "beyond question, . . . from the history, wording and structure of [25 U.S.C. § 177] . . . ." 528 F.2d at 379. It noted further that "[t]he reasons behind Congress' inaction are too problematical for the matter to have meaning for purposes of statutory construction." *Id.* at 378.

■ Thus, while the defendant's historical arguments may cast some doubt on the meaning of the statute, they, at best, add a shade of ambiguity to an otherwise relatively unambiguous statute. As one court has noted: "the plainer the language, the more convincing contrary legislative history must be." *United States v. United States Steel Corp.,* 482 F.2d 439, 444 (7th Cir.), *cert. denied,* 414 U.S. 909, 94 S.Ct. 229, 38 L.Ed.2d 147 (1973). When considered in light of the Supreme Court's admonition that "statutes passed for the benefit of dependent Indian tribes . . . are to be liberally construed, doubtful [constructions] being resolved in favor of the Indians," *Wilson v. Omaha Indian Tribe,* 442 U.S. 653, 666, 99 S.Ct. 2529, 2537, 61 L.Ed.2d 153 (1979), it is clear that the defendant has failed to carry its burden of establishing a contrary legislative history sufficient to overcome the apparent meaning of the statute, discernable from the language of the Act alone.

**23.** Several other courts have come very close to deciding this issue. In *Oneida Indian Nation v. County of Oneida,* 434 F.Supp. 527, 540 (N.D.N.Y.1977), *on remand from* 414 U.S. 661, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974), Judge Port noted that the Nonintercourse statute applied in New York in spite of the fact that New York was one of the original 13 states. That case does not necessarily resolve the issue here since the Oneida Indian Nation had the benefit

*Case Law*

Both parties insist that the relevant case law on this issue substantiates their claims, and both set forth exhaustive discussions of early 19th century cases as well as opinions rendered in the last decade. In spite of extensive searches by both parties, however, there is apparently no reported opinion which specifically rules on the geographic applicability of the land transfer section of the Trade and Intercourse Act. In other words, this precise issue appears to be a question of first impression.[23]

While the early Supreme Court cases are of some assistance in resolving this particular question, they are difficult to decipher and even more difficult to apply. Most do not even discuss the Nonintercourse statutes and focus instead on constitutional and jurisprudential concepts. Moreover, the florid style of the early opinions converts many of them into "litigant[s'] wishing-well[s] into which, it sometimes seems, one may peer and find nearly anything he wishes." *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 273 (2d Cir. 1979).

Fortunately, however, this court need not wade through the dense prose of this country's earliest jurists, for this task has already been done by Justice White in his opinion for the Court in *Oneida Indian Nation v. County of Oneida,* 414 U.S. 661, 666–78, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974). There, after an extensive review of prior case law, the Court concluded:

"It very early became accepted doctrine in this Court that although fee title to the lands occupied by Indians when the colonists arrived became vested in the sovereign—first the discovering European nation and later the original States and the United States—a right of occu-

of a federal treaty and may have been located to the west of the "Indian country" boundary lines during the early 1790's.

In *Narragansett Tribe v. Southern Rhode Island Land Development Corp., supra* at 803, 804, Chief Judge Pettine appears implicitly to have resolved the question in favor of the Indians, although it is not clear that the issue was directly presented by the parties.

pancy in the Indian tribes was nevertheless recognized. That right, sometimes called Indian title and good against all but the sovereign, could be terminated only by sovereign act. Once the United States was organized and the Constitution adopted, these tribal rights to Indian lands became the exclusive province of the federal law. Indian title, recognized to be only a right of occupancy, was extinguishable only by the United States. The Federal Government took early steps to deal with the Indians through treaty, the principal purpose often being to recognize and guarantee the rights of Indians to specified areas of land. This the United States did with respect to the various New York Indian tribes, including the Oneidas. The United States also asserted the primacy of federal law in the first Nonintercourse Act passed in 1790, 1 Stat. 137, 138, which provided that 'no sale of lands made by any Indians . . within the United States, shall be valid to any person . . . or to any state . . . unless the same shall be made and duly executed at some public treaty, held under the authority of the United States.' This has remained the policy of the United States to this day. See 25 U.S.C. § 177.

" . . .

"*The rudimentary propositions that Indian title is a matter of federal law and can be extinguished only with federal consent apply in all of the States, including the original 13.* It is true that the United States never held fee title to the Indian lands in the original States as it did to almost all the rest of the continental United States and that fee title to Indian lands in these States, or the preemptive right to purchase from the Indians, was in the State, *Fletcher v. Peck,* 6 Cranch 87, 3 L.Ed. 162 (1810). But this reality did not alter the doctrine that federal law, treaties, and statutes protected Indian occupancy and that its termination was exclusively the province of federal law."

*Id.* at 667, 668, 670, 94 S.Ct. at 777, 778–779 (footnotes omitted) (emphasis added).

It is true that the precise issue raised here was not before the Court in *Oneida.* There, the Oneida Indian Nation had filed a suit in federal court claiming a right to possession of lands and had based its claim, as do the Indians here, on 25 U.S.C. § 177. The defendants in *Oneida* moved to dismiss the action on the grounds that the court lacked federal question jurisdiction. Under the "well-pleaded complaint" doctrine the test which the Supreme Court applied was whether the Indians' claim was not "so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy within the jurisdiction of the District Court . . . .." *Id.* at 666, 94 S.Ct. at 777. In resolving this question the Court concluded:

"*Given the nature and source of the possessory rights of Indian tribes to their aboriginal lands,* particularly when confirmed by treaty, it is plain that the complaint asserted a controversy arising under the Constitution, laws, or treaties of the United States within the meaning of both § 1331 and § 1362."

*Id.* at 667, 94 S.Ct. at 777 (emphasis added). Thus, where the Supreme Court apparently needed only to conclude that the Indians asserted a colorable claim, its discussion went further and virtually settled the question of the geographic applicability of 25 U.S.C. § 177.

To this extent, the Supreme Court language may be considered dictum, as the defendant suggests, since its reach was further than required under the circumstances. Nonetheless, it was necessary for the Court at least to consider the Indians' claim, the territorial applicability of 25 U.S.C. § 177, and the question whether section 177 applied outside of Indian country. The latter question was explicitly put in issue by the brief and argument of one of the litigants before the Court. At worst, then, the explicit discussion of the Supreme Court in *Oneida* is reasoned dictum. Contrary to Connecticut's argument, the mere fact that the language might be considered dictum does not permit this court to "cavalierly

disregard it. . . . While such dictum is not binding upon [the court], it must be given considerable weight and can not be ignored in the resolution of the close question [this court has] to decide." *United States v. Bell*, 524 F.2d 202, 206 (2d Cir. 1975); *see Warren v. Harvey*, 472 F.Supp. 1061, 1072 (D.C.Conn.1979). Since the *Oneida* opinion reaches the same conclusion that this court has reached after considering the language and the history of the Act, the *Oneida* Court's analysis and conclusions based on prior case law provide substantial additional support for the plaintiff's position, if indeed, they are not controlling.[24]

Defendant argues that a very recent Supreme Court decision undercuts the force of the language in *Oneida*. In the case of *Wilson v. Omaha Indian Tribe, supra*, the Court, again by Justice White, reasoned that section 22 of the 1834 Trade and Intercourse Act was intended to apply solely in Indian country. Defendant argues that this is entitled to significance here because section 22, like the section on land conveyances, contains no express geographical limitations. Thus, the defendant argues, the Supreme Court has impliedly held that all sections of the Trade and Intercourse Acts are similarly limited.

While there may be some merit to the argument, this court does not attribute much significance to it. Section 22 deals only with a procedural rule which places the burden of proof on a "white person" in any civil dispute with an Indian over property. The precise question before the Supreme Court was whether the State of Iowa was a "white person" under the statute. In reaching the conclusion that Iowa was not a "white person," the Court did not have to rule that the Act applied only in Indian country. Unlike *Oneida*, the Court did not consider prior case law nor did it elaborate on this point. Throughout the opinion, *Oneida* is cited favorably with no hint that it was being overruled *sub silentio*.

Furthermore, there is a noteworthy distinction between section 22 and the Nonintercourse section at issue here. Section 22, unlike most of the sections of the Trade and Intercourse Act, was first added to the Act as late as 1822. Unlike the land conveyance section, it is not based on prior provisions dating back to 1790, shortly after the ratification of the Constitution. In particular, unlike the land conveyance section, section 22 was not based on a history of prior enactments, each of which expressly indicated that the section was applicable throughout the United States.[25]

Therefore, for the reasons stated above, this court concludes that *Wilson v. Omaha Indian Tribe* has not altered the import of the Supreme Court's clear expression in *Oneida*. *Oneida*, with its summary of prior case law, stands as strong support for the plaintiff's position.

### Conclusion

"For purposes of this motion [the court] may look only at the pleadings, with all of the 'well-pleaded material facts alleged in the complaint . . . taken as admitted' . . . ., and the complaint should not be dismissed 'unless it appears beyond doubt that the plaintiff can prove no set of facts

---

**24.** On remand from the Supreme Court's decision in *Oneida, supra*, Judge Port concluded that the Supreme Court's language established the geographic applicability of 25 U.S.C. § 177. In other words, the Supreme Court's treatment of this question was not considered solely as dicta, but rather was treated as binding on the District Court. *Oneida Indian Nation v. County of Oneida*, 434 F.Supp. 527, 540 (N.D.N.Y. 1977).

**25.** Justice White himself was unwilling to extend the interpretation of the words "white person" in section 22 to any other section of the Act, in spite of the urging of two concurring members of the Court. The Court refused to do so because the other provision in the Act which used the words "white person," section 16, had a different and "distinct legislative history." *Wilson v. Omaha Indian Tribe, supra*, 442 U.S. at 666, n.16, 99 S.Ct. at 2537. Section 16, like the land conveyance section and unlike section 22, has predecessor provisions in every Act since 1790. Because the history of section 16 parallels that of the land transfer section at issue here, the Court's refusal to extend its ruling to section 16 based on a "distinct legislative history" is some evidence that the *Wilson* dictum should not be extended to other provisions of the Act.

in support of his claim which would entitle him to relief.'" *George C. Frey Ready-Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.*, 554 F.2d 551, 553 (2d Cir. 1977) (citations omitted). Since the Nonintercourse statute is applicable to the lands at issue here, it is clear that the complaint of the Mohegan Tribe does state a claim upon which relief may be granted. Therefore, the defendant's motion is denied.

SO ORDERED.