Thomas CUSANELLI,
Plaintiff-Appellant,

v.

Leonard KLAVER, Defendant-Appellee,

and

Perko Manufacturing Corp., Perkins Marine Lamp & Hardware Corp., and Perko, Inc., Defendants.

No. 457, Docket 82–6179.

United States Court of Appeals, Second Circuit.

Argued Nov. 4, 1982.

Decided Jan. 4, 1983.

Lester E. Fetell, Brooklyn, N.Y. (Peter I. Hoppenfeld, and Fetell & Coen, Brooklyn, N.Y., on the brief), for plaintiff-appellant.

Janis G. Schulmeisters, U.S. Dept. of Justice, New York City (J. Paul McGrath, Asst. Atty. Gen., Washington, D.C., and Raymond J. Dearie, U.S. Atty., Brooklyn, N.Y., on the brief), for defendant-appellee.

Before TIMBERS, KEARSE and PIERCE, Circuit Judges.

TIMBERS, Circuit Judge:

On this appeal from a judgment entered in the Eastern District of New York, Thomas C. Platt, Jr., *District Judge,* 542 F.Supp. 677, dismissing this maritime complaint against Leonard Klaver (and the United States), the essential question is whether the EL MAR II (El Mar), a grounded vessel whose skipper was a member of the Coast Guard Auxiliary (Auxiliary), was a "public vessel" within the meaning of 14 U.S.C. § 827 (1976) [1] at the time a commissioned Coast Guard cutter, the CG 413–49, attempted to refloat the grounded El Mar. More specifically, the key issue is whether the district court correctly held that "authorized Coast Guard duty" within the meaning of § 827 embraces an auxiliary Coast Guard vessel on its return voyage to its home port and outside its designated patrol area.

We hold that the district court correctly construed the statute. We affirm.

I.

The facts are straightforward and are not in dispute. All events occurred on May 27, 1978.

Klaver was on patrol in his 35 foot motorboat, the El Mar, pursuant to his duties as a member of the Auxiliary. Klaver was an experienced boatsman and had completed the required courses necessary to become a member of the Auxiliary. He had reported to the Freeport, Long Island marina where his boat was tied up. He set out on patrol with two other Auxiliary members as his crew. The three wore Auxiliary uniforms and placed an Auxiliary sign on each side of the vessel, identifying the El Mar as an Auxiliary vessel.

---

1. 14 U.S.C. § 827 (1976) provides:
"Any motorboat or yacht, while assigned to authorized Coast Guard duty shall be deemed to be a public vessel of the United States, and within the meaning of section 646 of this title shall be deemed to be a vessel of the Coast Guard."

After Klaver and his crew completed their pre-departure check, they proceeded to the Coast Guard's Atlantic Beach station where Klaver received from the Coast Guard his written patrol order for the day. Klaver and his crew were assigned to patrol from 1 P.M. to 6 P.M. in the area from Hog Island to Reynolds Channel. According to the patrol order, Klaver was expected to return to Freeport at 6:30 P.M.[2]

During its patrol, the El Mar assisted two disabled pleasure boats. After the second assist, at approximately 4:30 P.M., the El Mar lost the use of one of its engines. Klaver then requested permission of the Coast Guard by radio "to secure the patrol" and to return to home port at Freeport. Permission was granted. En route back to Freeport, the El Mar ran aground on a bar or shoal. Klaver radioed the Coast Guard for assistance. The 41 foot Coast Guard cutter, CG 413–49, was sent to assist the El Mar. Appellant Thomas Cusanelli, a full time active Coast Guardsman, was aboard the CG 413–49 when it attempted to assist the El Mar.

While the Coast Guard cutter was attempting to tow the El Mar, a metal stern cleat on the El Mar, to which the tow line was secured, came loose, hurtled onto the Coast Guard cutter, and struck Cusanelli. The cutter left to obtain medical assistance for Cusanelli. Another vessel subsequently assisted the El Mar, which returned to Freeport and tied up there at 6:30 P.M.

to recover damages for personal injuries he claimed to have sustained as a result of the towing operation. He asserted a negligence claim against Klaver and a products liability claim against Perko Manufacturing Corp., Perkins Marine Lamp & Hardware Corp., and Perko, Inc., the last three being the manufacturers and distributors of the metal cleat.

The United States, acting on behalf of Klaver, removed the action to the District Court for the Eastern District of New York. The grounds for removal were that, at the time of the accident, Cusanelli was on active duty as a Coast Guardsman; Klaver was a member of the Coast Guard Auxiliary; the El Mar, having been assigned to authorized Coast Guard duty, was a public vessel within the meaning of 14 U.S.C. § 827 (1976); and, for reasons developed more fully below, the action may be maintained, if at all, only against the United States, not its agent, Klaver. 46 U.S.C. § 745 (1976).

Cusanelli moved to remand the action to the state court. That motion was denied. The United States, on behalf of Klaver, moved to dismiss the complaint for lack of subject matter jurisdiction. That motion was granted in a reasoned opinion by Judge Platt dated June 23, 1982.[3]

From the judgment dismissing the complaint, Cusanelli has taken the instant appeal.

## II.

Cusanelli commenced an action in the New York Supreme Court, Queens County,

## III.

Cusanelli's essential claim on appeal is that an Auxiliary member's boat should not

---

2. What constitutes patrol duty is an aspect of the issue on appeal. A distinction apparently can be made between patrol time en route to a patrol area and time actually spent within the patrol area, although both are characterized by the Coast Guard Auxiliary as patrol time. According to Lt. Comm. Alvin Sarra, Jr., Chief of Operations of the Auxiliary Division of the Coast Guard, patrol time includes travel time to and from the patrol station as well as time spent in the patrol area itself. He testified that

"[while traveling to and from a patrol station], they have their sign boards up, they're in uniform. They're displaying the Auxiliary ensign and the operational pennant. They're monitoring the required channels."

3. The district court's decision does not affect Cusanelli's right to pursue his state court action for products liability against the three remaining defendants other than Klaver. The

be viewed as assigned to Coast Guard duty and therefore as a public vessel pursuant to § 827 when an Auxiliary member is *returning home* from patrol.

The significance of § 827 in the instant case is that, if it is applicable, Cusanelli is barred, as the district court held,[4] from suing either Klaver or the United States for injuries sustained by Cusanelli. There are two reasons for this. First, the relevant statutory authority requires that, when a public vessel is the subject of an action, that action must be commenced under the terms of the Public Vessels Act, 46 U.S.C. §§ 781–90 (1976). Section 782 of the Public Vessels Act incorporates by reference, *inter alia,* § 745 of the Suits in Admiralty Act, 46 U.S.C. § 745 (1976), which provides that any action involving the ownership or operation of a public vessel may be brought only against the United States.[5] Consequently, the United States, not Klaver, is the proper defendant in the instant action if the El Mar comes within the public vessel coverage of § 827. Second, once the United States replaces Klaver as a defendant, the bar of *Feres v. United States,* 340 U.S. 135 (1950), applies. Under *Feres,* a serviceman cannot sue the government under the Federal Tort Claims Act for service-incurred injuries. *Id.* at 146. And, by analogy, since Cusanelli was a Coast Guardsman on duty when he was injured, Cusanelli would be barred under *Feres* from suing the govern-

ment. *Charland v. United States,* 615 F.2d 508, 509 (9 Cir.1980) (*Feres* doctrine applicable to action brought pursuant to Public Vessels Act); *Beaucoudray v. United States,* 490 F.2d 86 (5 Cir.1974) (*Feres* doctrine applicable to Suits in Admiralty Act and Public Vessels Act). The district court in the instant case concluded that, once it held that Klaver's use of the El Mar at the time of the accident was "incident to its use as an Auxiliary vessel", the *Feres* bar applied.

In view of the claims of the parties, we find it necessary and appropriate to determine the scope of "authorized Coast Guard duty" within the meaning of § 827 under the circumstances of this case.[6] If, as Cusanelli argues, it is impermissible to conclude from the legislative history of § 827 that Congress contemplated that public vessel status would extend to a return voyage to home port from a patrol area, *Feres* would not be applicable here. If, on the other hand, the interpretation urged by the United States of the legislative history is found persuasive, *Feres* would bar this action. We turn directly to the competing claims of the respective parties.[7]

## IV.

The Coast Guard Auxiliary was created by an Act of Congress in 1941. Coast Guard Auxiliary and Reserve Act of 1941

court remanded the balance of the case to the New York State Supreme Court.

**4.** The district court, in analyzing the question of whether "public vessel" status was applicable to the instant case, relied on New York case law with respect to the master-servant relationship. The district court's analysis of the scope of employment is persuasive, assuming that state law controls or assists our interpretation of § 827. Since we believe, however, that this appeal turns on federal statutory interpretation, we find it unnecessary to review the district court's analysis of state law—however meritorious it may be. Moreover, the parties on appeal have eschewed any reliance upon state law and have confined their arguments to federal law believed to be relevant to § 827.

**5.** Pursuant to 46 U.S.C. § 745, remedies provided by the Suits in Admiralty Act are "exclusive

of any other action ... against the agent or employee of the United States...." In the instant case Klaver acted as an agent of the United States.

**6.** We recently dealt with the public vessel issue in *Dick v. United States,* 671 F.2d 724 (2 Cir. 1982). We did not reach the question there, however, of how "authorized Coast Guard duty" under § 827 should be interpreted. That is the narrow question presented on this appeal. It apparently is a question of first impression.

**7.** Although the authority to administer the Coast Guard Auxiliary has been delegated to the Commandant of the Coast Guard, 33 C.F.R. § 5.05 (1982); 49 C.F.R. § 1.46(b) (1982), and he is authorized to delegate his administrative authority to other Coast Guard personnel, 33

("1941 Act"), Pub.L. No. 77–8, 55 Stat. 9 (current version at 14 U.S.C. §§ 751–832 (1976)). The purpose of the Auxiliary, among others, was to assist the Coast Guard in its supervision of motorboats and yachts and otherwise to promote wider knowledge of and greater compliance with laws pertaining to such boats. Since participation by nonmilitary personnel as members of the Auxiliary was essentially on a good samaritan basis, § 7 of the 1941 Act provided that any boat while assigned to Coast Guard duty as an Auxiliary vessel was deemed a public vessel of the United States. 1941 Act, ch. 8, § 7, 55 Stat. 10.[8] This limited the liability of Auxiliary members for accidents that occurred during the course of assigned Auxiliary duties.

The plain meaning of § 7 is not helpful in deciphering what Congress intended by the phrase "while assigned to [authorized] Coast Guard duty."[9] It is unclear from this statutory language whether assigned duty commences at the time an Auxiliarist leaves home port or when he or she arrives at a designated patrol area—in the case of Klaver, at the Hog Island-Reynolds Channel area. Furthermore, the section does not indicate when assigned duty terminates. Consequently, it is necessary to examine the legislative history to ascertain Congress' intent.

Section 7 of the 1941 Act had its origins in § 5 of the Coast Guard Reserve Act of 1939 ("1939 Act"), Pub.L. No. 76–152, 53 Stat. 854–55 (repealed by 1941 Act). The 1939 Act established the Coast Guard Reserve (Reserve), a forerunner to the Coast Guard Auxiliary, to assist the Coast Guard in performing emergency duties and conducting regattas and marine parades. H.R. Rep. No. 600, 76th Cong., 1st Sess. 3 (1939). No compensation was paid to Reserve members for their personal services, but actual expenses incurred in the operation of a Reserve member's craft were reimbursed. *Id.; see also* 84 Cong.Rec. 7098 (1939). Section 5 of the 1939 Act provided that, while assigned to Coast Guard duty, Reserve vessels were public vessels of the United States and vessels of the Coast Guard. The House Report accompanying the House Bill contained a succinct commentary on § 5: "This provision is believed desirable in order that such craft, while so assigned, will not be amenable to the provisions of all the navigation laws and in order that the owners may be relieved of liability for any claim for damages resulting from the operation of such motorboats and yachts." H.R.Rep. No. 600, *supra,* at 3 (letter from Acting Secretary of Treasury Stephen Gibbons to Speaker of House of Representatives). Thus, although the House Report indicates that the purpose of § 5 was to insulate the reservist from liability, it does not define the scope of assigned duty covered by the section.

In 1941, Congress repealed the 1939 Act and created two discrete adjuncts to the Coast Guard: the Coast Guard Auxiliary

---

C.F.R. § 5.07 (1982), we have not found any rules promulgated pursuant to this chain of delegation that are dispositive in interpreting § 827. Furthermore, since it appears that the Coast Guard has not demonstrated a *consistent* pattern of interpretation of § 827, *see NLRB v. Hendricks Cty. Rural Electric Membership Corp.,* 454 U.S. 170, 177 (1981), and has addressed the question of an Auxiliarist's liability in only a few isolated and ambiguous contexts, we find no effective guidance in the Coast Guard's Auxiliary Manual and other Coast Guard sources in interpreting § 827. Moreover, much of the material referred to us concerning an Auxiliarist's liability pertains to § 832, not to § 827. *See* note 10 *infra,* and accompanying text. Consequently, our analysis is limited to other traditional sources of statutory interpretation, e.g., plain meaning, legislative history, legislative purpose, and reasonable interpretation. *See also* 33 C.F.R. § 5.43(a) (1982) (repeating the substance of § 827).

**8.** Section 7 provided that "[a]ny motorboat or yacht, while assigned to Coast Guard duty as herein authorized, shall be deemed to be a public vessel of the United States, and within the meaning of the Act of June 15, 1936 ... shall be deemed to be a vessel of the United States Coast Guard." Except for minor changes, the current § 827 is identical to § 7 of the 1941 Act. Note 1 *supra.*

**9.** As stated in note 8 *supra,* this phrase originally appeared in § 7 of the 1941 Act as "while assigned to Coast Guard duty as herein authorized".

and the Coast Guard Reserve. 1941 Act, *supra*. Former § 5 of the 1939 Act, however, was reenacted without change in connection with the .Coast Guard Auxiliary. S.Rep. No. 31, 77th Cong., 1st Sess. 4 (1941). Minor changes in phraseology were made in 1949 which have no relevance here. Thus, the only substantive discussion with respect to the legislative history of § 7 of the 1941 Act (and its antecedent in the 1939 Act) is the rather sparse commentary in the 1939 House Report. Consequently, the legislative history of § 7 (and § 5 of the 1939 Act) does not end our inquiry.

Although the plain meaning of § 7 and the legislative history of that section (and § 5 of the 1939 Act) do not provide a dispositive answer to the narrow question raised on appeal, it is hornbook law that a court should seek the most reasonable interpretation of a statute and utilize its legislative purpose to the extent that they assist in that inquiry. In the instant case, the purpose of § 827 is clear. That section was included in the 1939 Act and the 1941 Act to insulate Reservists (under the 1939 Act) and Auxiliarists (under the 1941 Act) from liability when carrying out their voluntary duties. There is nothing in the purpose of the Acts or in the House Report's brief commentary on § 5 of the 1939 Act that indicates that this protection was intended to be narrowly construed.

It is true, as appellant points out, that § 832 was amended in 1974 to extend personal injury coverage to Auxiliarists when "traveling back and forth between the place of assigned duty and the *permanent residence* of a member of the Auxiliary," 14 U.S.C. § 832 (1976) (emphasis added).[10] While it plausibly may be inferred from the lack of revision of § 827 that Congress intentionally failed to amend the latter section, it is equally plausible that Congress saw no need to expand the "assigned to authorized Coast Guard duty" language of § 827. We hold that the narrow construction of § 827 suggested by appellant is in-

consistent with the insulation from liability purpose of the section and that the 1974 amendment to § 832 is neither controlling nor persuasive with respect to Congress' purported intentional failure to amend § 827.

Finally, it is highly doubtful that the most reasonable interpretation of § 827 would terminate public vessel coverage when an Auxiliarist is returning to his port from an assigned patrol area. If appellant's construction of assigned duty under § 827 were adopted, an Auxiliarist conceivably could be held personally liable for a collision with another vessel even if the Auxiliarist, without experiencing engine problems (as in the instant case), were ordered to return to home port, after spending only a short time in the patrol area and the collision occurred during the return voyage to home port. In such a situation, the Auxiliarist throughout the trip would be bearing all the symbols of the Coast Guard Auxiliary (e.g., uniform and sign) and would be acting solely pursuant to Coast Guard Auxiliary orders, not for personal pleasure. If we were to apply appellant's interpretation of § 827, this hypothetical Auxiliarist would be denied public vessel protection under § 827 simply because he or she was not in the designated patrol area when the collision occurred. Such a result is untenable, both in this hypothetical case and in the instant case, particularly since in both the Auxiliarist made the trip to the patrol area solely to carry out Coast Guard Auxiliarist orders and not for personal pleasure.

We hold that § 827 public vessel status applies to the entire trip made by an Auxiliarist when traveling pursuant to Coast Guard Auxiliary orders to and from a patrol area, as well as while traveling within the designated patrol area itself; and that it applied to Klaver during his entire trip on May 27, 1978.

Affirmed.

---

10. According to S.Rep. No. 770, the purpose of expanding the coverage of § 832 was to "further encourage the Auxiliarists in their per-

formance of duties." S.Rep. No. 770, 93rd Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Ad.News 3061, 3065.