STATE OF CONNECTICUT, ex rel. Richard BLUMENTHAL, Attorney General of the State of Connecticut, Plaintiff,

v.

Bruce BABBITT, Secretary of the Interior, United States of America, Defendant.

TOWNS OF LEDYARD, NORTH STONINGTON, AND PRESTON, CONNECTICUT, Plaintiffs,

v.

The UNITED STATES of America, Bruce Babbitt, Secretary of the Department of the Interior, Ada Deer, Assistant Secretary of the Interior for Indian Affairs, and Franklin Keel, Acting Area Director for the Eastern Area Office of the Bureau of Indian Affairs, Defendants.

Nos. 3:95CV849 (RNC), 3:95CV1211 (RNC).

United States District Court, D. Connecticut.

Dec. 15, 1998.

Richard Blumenthal, Attorney General, David H. Wrinn, Attorney General's Office, Environmental Department, Hartford, CT, for State of Connecticut, ex rel. Richard Blumenthal, Attorney General, plaintiff.

Robert L. Deitz, Benjamin S. Sharp, Donald C. Baur, Perkins Coie, Washington, DC, for Town of Ledyard, Town of North Stonington, Town of Preston, plaintiffs.

John B. Hughes, U.S. Attorney's Office, New Haven, CT, Barry W. Brandon, Joel D. Armstrong, Ann C. Juliano, U.S. Dept. of Justice, Environment & Natural Resources Div., Washington, DC, for U.S. Dept. of Interior, Bruce Babbitt, Secretary of the Dept. of Interior, defendant.

John B. Hughes, U.S. Attorney's Office, New Haven, CT, Barry W. Brandon, Joel D. Armstrong, Ann C. Juliano, U.S. Dept. of Justice, Environment & Natural Resources Div., Washington, DC, for Ada Deer, Assistant Secretary of the Interior for Indian Affairs, defendant.

John B. Hughes, U.S. Attorney's Office, New Haven, CT, for U.S., Franklin Keel, Acting Area Director for the Eastern Area Office of the Bureau of Indian Affairs, defendant.

## RULING ON MOTIONS FOR SUMMARY JUDGMENT

CHATIGNY, District Judge.

In these consolidated actions, the State of Connecticut and three Connecticut towns challenge a decision of the Secretary of the Interior to take into trust, for the benefit of the Mashantucket Pequot Tribe of Indians, 165 acres of land owned by the Tribe. Plaintiffs claim that the Connecticut Indians Land Claims Settlement Act (the "Settlement Act" or "Act"), 25 U.S.C. §§ 1751–60, prohibits the Secretary from taking the land into trust. The Secretary contends that his decision is a valid exercise of his general authority under section 5 of the Indian Reorganization Act (the "IRA"), 25 U.S.C. § 465, to take land into trust for the benefit of Indians. Each party has moved for summary judgment. For reasons that follow, the court concludes that the Secretary's decision violates the Settlement Act. Accordingly, plaintiffs' motions for summary judgment [doc. # 69 and doc. # 91] are granted and defendants' motion [doc. # 65] is denied.[1]

### Background

The material facts are not in dispute. In January 1993, the Tribe filed an application asking the federal government to take into trust, for the benefit of the Tribe, title to certain parcels of land owned by the Tribe in the towns of Ledyard, North Stonington and Preston. The application initially requested transfer of approximately 245 acres. In May 1995, the government announced that it intended to take the land into trust. The Secretary subsequently agreed to defer taking title to the land in anticipation of the present litigation.

While this litigation was pending, the Tribe withdrew its request with regard to approximately 80 acres of land included in the original application.[2] In May 1996, the Secretary issued a notice that the rest of the land, totaling approximately 165 acres, would be taken into trust.

---

1. Plaintiffs also contend that section 5 of the IRA, pursuant to which the Secretary purports to act, represents an unconstitutional delegation of authority to the executive branch and violates the Tenth Amendment; that the Mashantucket Pequot Tribe of Indians are not "Indians" as that term is used in the IRA; and that the Secretary's decision to take the land at issue into trust for the benefit of the Tribe is arbitrary, capricious and in violation of the National Environmental Policy Act and Coastal Zone Management Act. Because plaintiffs' argument based on the Settlement Act is dispositive, it is unnecessary to address plaintiffs' other contentions.

2. The withdrawal occurred after it was discovered that the 80 acres had been purchased with funds provided to the Tribe through the Mashantucket Pequot Settlement Fund created pursuant to the Settlement Act See 25 U.S.C. § 1754(a). Under defendants' reading of the Settlement Act, described further below, that fact rendered the 80 acres ineligible for trust status.

Plaintiffs challenge the Secretary's decision pursuant to the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. § 702, *et seq.* They seek a declaration that the Secretary's decision violates the Settlement Act and an order permanently enjoining the Secretary from taking the land into trust.

## Discussion

■ The question presented by the pending motions is whether the Settlement Act prohibits the Secretary from taking the 165 acres at issue into trust for the Tribe pursuant to his general authority to take land into trust under section 5 of the IRA (the Secretary's § 465 authority). The parties agree that the Settlement Act limits the Secretary's § 465 authority to some degree. However, they disagree on the scope of the limitation.

Plaintiffs claim that § 1754(b)(8) of the Act prohibits the Secretary from taking land into trust for the benefit of the Tribe if the land is located outside the "settlement lands" as defined in § 1752 of the Act (the "settlement lands"). Because the land at issue in this case is outside the boundaries of the settlement lands, plaintiffs contend that § 1754(b)(8) prohibits the Secretary from exercising his § 465 authority to take the land into trust. Defendants maintain that § 1754(b)(8) prohibits the Secretary from exercising his general authority to take land into trust for the benefit of the Tribe only if the land is located outside the settlement lands *and* has been purchased with federal money provided to the Tribe pursuant to the Settlement Act. Because the land at issue was purchased with other money, defendants contend that § 1754(b)(8) does not bar the Secretary from taking the land into trust.

In practical terms, the issue is whether the area under the sovereignty of the Tribe can be expanded against the wishes of the State and the Towns without congressional approval. The plaintiffs contend, in effect, that the Settlement Act fixed the boundaries of the territory that may become part of the Tribe's reservation and that further territory may not be placed under the sovereignty of the Tribe except by act of Congress. The defendants, on the other hand, contend that the Settlement Act enabled the Tribe to expand its reservation within the boundaries set forth in the Act without disturbing the Secretary's § 465 authority to further expand the area under the Tribe's sovereignty by taking more land into trust for the Tribe.

This appears to be the first case in which a state has opposed a trust acquisition by the Secretary on the ground that the acquisition is barred by a federal statute approving an Indian land claims settlement. Congress has enacted numerous settlement acts. *See* 25 U.S.C. § 1701 *et seq.* One of them contains a provision expressly precluding the federal government from relying on any other authority to acquire land in trust for the benefit of the Indians. *See* Maine Indian Claims Settlement Act, 25 U.S.C. § 1724(e). Another contains a provision expressly preserving the federal government's authority to take land into trust for the benefit of the Indians under § 465. *See* Washington Indian (Puyallup) Land Claims Settlement Act, 25 U.S.C. § 1773c. The Settlement Act does not contain such an express provision one way or the other. However, using traditional tools of statutory construction, it appears that Congress, in enacting the Settlement Act, intended to approve a unique jurisdictional arrangement worked out by the Tribe and the State that could not be disturbed without congressional approval. Accordingly, the plaintiffs are entitled to summary judgment in their favor.[3]

To understand the parties' arguments, it is helpful to review the relevant statutory framework. In 1934, Congress enacted the IRA as part of a comprehensive restructuring of the manner in which the federal government dealt with Indians and Indian issues. *See* Felix S. Cohen, *Handbook of Federal Indian Law* 83–87 (1988 ed.).[4] Sec-

---

**3.** Summary judgment may be granted when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1985). Because the material facts are not in dispute, and plaintiffs have a legal right to the relief they seek, summary judgment is appropriate.

**4.** The purpose of the IRA was "to rehabilitate the Indian's economic life and to give him a chance to develop the initiative destroyed by a century of

tion 5 of the IRA, codified at 25 U.S.C. § 465, grants the Secretary broad authority to acquire land for Indians, either by purchase or other means, and to take that land into trust.[5]

Land taken into trust under § 465 is insulated from state and local control in at least three important respects. First, trust land is considered "Indian country" for jurisdictional purposes. *Oklahoma Tax Commission v. Citizen Band Potawatomi Indian Tribe of Oklahoma,* 498 U.S. 505, 511, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991). As such, it is removed from state civil and criminal jurisdiction, unless the tribe consents to such jurisdiction. 25 U.S.C. §§ 1321, 1322. Second, pursuant to the terms of § 465, trust land is exempt from state and local taxation. 25 U.S.C. § 465. And third, under regulations of the Department of the Interior, trust land is exempt from state and local land use regulation, in the absence of a specific dispensation from the Secretary, which is to be based upon "the best interest of the Indian owner or owners." 25 C.F.R. § 1.4; *see also Santa Rosa Band of Indians v. Kings County,* 532 F.2d 655, 664–66 (9th Cir.1975).

In 1983, Congress passed the Settlement Act.[6] The purpose of the legislation was "to provide Congressional ratification and implementation of a settlement of claims to land and consequential damages that [had] been raised [in a federal lawsuit filed] by the

Mashantucket Pequot Tribe" in 1976. S.Rep. No. 98–222, 98th Cong., 1st Sess. 5 (1983); *see* 25 U.S.C. § 1751(a). In the underlying lawsuit the Tribe had asserted claims arising from mid-nineteenth century transactions involving land "formerly held by the Tribe." H.R.Rep. No. 98–43, 98th Cong., 1st Sess. 1 (1983). The Tribe claimed that those transactions "violated the Nonintercourse ... provision of the Trade and Intercourse Act," *id.,* which contained a restraint against alienation of Indian lands.[7]

The defendants named in the Tribe's complaint were private parties in possession of the disputed lands. The State subsequently entered the action as a third-party defendant and became an active participant in the litigation. *See Western Pequot Tribe of Indians v. Holdridge Enterprises Incorporated, et al.,* Civil Action No. H76–193 (D.Conn.). In 1980, a motion to dismiss a similar lawsuit presenting aboriginal land claims was rejected by this court. *See Mohegan Tribe v. State of Connecticut,* 483 F.Supp. 597 (D.Conn.) (denying State's motion to dismiss on the basis that the Nonintercourse Act allegedly applied only to western areas of the United States, and not to the earlier settled eastern states), *aff'd,* 638 F.2d 612 (2nd Cir. 1980), *cert. denied,* 452 U.S. 968, 101 S.Ct. 3124, 69 L.Ed.2d 981 (1981). Following that decision, the Tribe, the defendant landowners and the State reached a settlement agreement.[8] That agreement became the Settle-

oppression and paternalism." *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 152, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973).

5. Section 465 provides in relevant part:
   The Secretary of the Interior is hereby authorized, in his discretion, to acquire, through purchase, relinquishment, gift, exchange, or assignment, any interest in lands, water rights, or surface rights to lands, within or without existing reservations, including trust or otherwise restricted allotments, whether the allottee be living or deceased, for the purpose of providing land for Indians....
   Title to any land acquired pursuant to [section 465] shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired, and such land or rights shall be exempt from State and local taxation.

6. The Settlement Act became law on October 18, 1983, upon President Reagan's signature of S.1499. An earlier version of the legislation,

S.366, had been vetoed by the President on April 5, 1983. The bill signed on October 18 was identical to the vetoed legislation except for a small change in the provision codified at 25 U.S.C. § 1751(f). *See* S.Rep. No. 98–222, 98th Cong., 1st Sess. 8–9 (1983). The counterpart to this legislation in the House was designated H.R. 982.

7. The current version of this provision, which has since become known as the "Nonintercourse Act," is codified at 25 U.S.C. § 177.

8. A Local Rule 16 notice filed by the Tribe on October 15, 1979 stated: "Plaintiff notifies the Court pursuant to Rule 16 of the local rules of this District Court that no action has been taken in this matter during the past year because settlement discussions are under way in this action, but have been stalled pending a resolution of the Motion to Dismiss ... in *Mohegan Tribe v. State of Connecticut,* [483 F.Supp. 597] Civil Action No. H–77–434. A decision by this District Court

ment Act. *See* S.Rep. No. 98–222, 98th Cong., 1st Sess. 5 (1983) ("[t]he settlement embodied in this Act was negotiated by the Mashantucket Pequot Tribe, the private landowners affected by the claim, and the State of Connecticut").

Like other federal statutes resolving Indian land claims, the Act addressed concerns besides ownership of the lands at issue in the underlying lawsuit.[9] The Act reflects that "the parties bargain[ed] for an arrangement with which they [could] live in the future," *Staff Memorandum—The Veto of S.366, The Mashantucket Pequot Indian Claims Settlement Act, in Mashantucket Pequot Indian Land Claims: Hearing on S.1499 Before the Senate Comm. on Indian Affairs*, 98th Cong., 1st Sess. 32 (1983)—that is, an arrangement providing a settlement of disputed issues "once and for all." *Settlement of Indian Land Claims in the States of Connecticut and Louisiana: Hearing on H.R. 5358 and H.R.6612 Before the House Comm. on Interior and Insular Affairs*, 97th Cong., 2nd Sess. 56 (1982) (prepared statement of Congressman Samuel Gejdenson of Connecticut).

The Act provided for federal recognition of the Tribe, which previously had been recognized only by the State. The Act redefined the Tribe's "reservation" to encompass "the existing [State-recognized] reservation of the Tribe," which consisted of about 200 acres, plus "any settlement lands taken in trust by the United States for the Tribe." 25 U.S.C.

§ 1752(7). The Act acknowledged the conveyance by the State to the Tribe of a twenty acre tract, and designated this tract part of the settlement lands, making it eligible for inclusion in the new federal reservation. 25 U.S.C. § 1752(4). The Act granted the Tribe the right to further expand the size of the reservation through purchases of additional settlement lands in a designated area of privately held lands, up to a maximum size of approximately 2,300 acres. 25 U.S.C. §§ 1752(3), (4) and (7), and § 1754(9).[10] The Act fixed the boundaries of that area with precision by approving and adopting an agreed upon line of demarcation drawn on a map. 25 U.S.C. § 1752(3). The Act provided the Tribe with $900,000 in federal funds (the "Settlement Fund") to enable it to buy land within that area. 25 U.S.C. §§ 1754(a), (b)(1), (b)(2), (e) and 1752(3), (4), (7).[11]

The Act confirmed the status of the Tribe's reservation as "Indian country," 25 U.S.C. § 1755, and affirmed that a federal restraint against alienation pursuant to the Nonintercourse Act, 25 U.S.C. § 177, applied to the lands of the reservation. 25 U.S.C. § 1757. Significantly for present purposes, the Act also declared that the reservation would be "subject to State jurisdiction to the maximum extent provided in [25 U.S.C. § 1321 *et seq.*]." 25 U.S.C. § 1755. Pursuant to that provision, the State retained the right to exercise civil and criminal jurisdiction over any lands acquired by or for the Tribe inside the settlement lands.

on that Motion is expected in the near future, and it is anticipated that settlement discussions with the office of the governor of the State of Connecticut will proceed if a decision favorable to the plaintiff in the *Mohegan* case is rendered. The governor's office has indicated interest in supporting a settlement...." Pl.'s Loc.Rule 16 Notice, *Western Pequot Tribe of Indians v. Holdridge Enterprises Incorporated, et al.*, Civil Action No. H76–193 (D.Conn. Oct. 15, 1979).

**9.** The precise terms of the settlement acts vary widely. However, in addition to providing for the extinguishment of the tribe's aboriginal claims, the acts typically grant the tribe land or money to buy land, and stipulate arrangements for future relations among the tribe, state, local municipalities and the federal government in regard to issues such as jurisdiction and the tax status of the tribal land. *See* 25 U.S.C. § 1701 *et seq.; Staff Memorandum—The Veto of S.366, The*

*Mashantucket Pequot Indian Claims Settlement Act, in Mashantucket Pequot Indian Land Claims; Hearing on S.1499 Before the Senate Comm. on Indian Affairs*, 98th Cong., 1st Sess. 32 (1983)

**10.** Memorandum from the Acting Area Director of the Bureau of Indian Affairs ("BIA"), Eastern Area, to the Acting Deputy Commissioner for Indian Affairs, dated January 27, 1995, *in* Administrative Record, I–W–5–6.

**11.** The Act provided that at least $600,000 of the Settlement Fund would be made available to the Tribe immediately to enable it to acquire "settlement lands" as defined in § 1752 of the Act. The Act further provided that any balance remaining in the Settlement Fund after the Tribe had completed its purchases of settlement lands could be disbursed to the Tribe but only pursuant to an approved economic development plan. *See* 25 U.S.C. §§ 1754(b)(1) and (2).

Several provisions of the Act addressed the trust responsibility of the federal government with regard to the Tribe. The parties' dispute concerning the impact of the Settlement Act on the Secretary's § 465 authority implicates these provisions. Section 1754(b)(5) of the Act provides:

> As the [Settlement] Fund or any portion thereof is disbursed by the Secretary in accordance with this section, the United States shall have no further trust responsibility to the Tribe or its members with respect to the sums paid, any subsequent expenditures of these sums, or any property other than private settlement lands or services purchased with these sums.

Section 1754(b)(7) provides:

> Lands or natural resources acquired under this subsection which are located within the settlement lands shall be held in trust by the United States for the benefit of the Tribe.

And, most important for present purposes, § 1754(b)(8) provides:

> Land or natural resources acquired under this subsection which are located outside of the settlement lands shall be held in fee by the Mashantucket Pequot Tribe and the United States shall have no further trust responsibility with respect to such land and natural resources. Such land and natural resources shall not be subject to any restriction against alienation under the laws of the United States.

■ The parties' dispute centers on the meaning of the phrase "acquired under this subsection" in § 1754(b)(8). Plaintiffs suggest, in effect, that the phrase means "acquired by or for the Mashantucket Pequot Tribe." Thus construed, the phrase renders § 1754(b)(8) a prohibition against the Secretary's accepting into trust any land located outside the settlement lands. The defendants contend that § 1754(b) of the statute, the section in which subsection (8) appears,

pertains to the use of the Settlement Fund and, accordingly, that the phrase "acquired under this subsection" means "purchased with money from the Settlement Fund." Construed in this manner, the provision's acknowledged prohibition on the Secretary's § 465 authority is not triggered in this case because the land at issue was not purchased with Settlement Fund money.

After considering the parties' submissions, the court concludes that the text of § 1754(b)(8) is ambiguous, requiring consideration of other evidence of legislative intent. The subdivision is ambiguous primarily because the phrase "acquired under this subsection" lacks intrinsic meaning. To attempt to ascribe meaning to the phrase, one can look to the other features of the subsection, but that exercise is also inconclusive. Most of the subdivisions in subsection (b) refer to the Settlement Fund, lending some weight to the defendants' suggested reading of the text, but not all of them do; like section (8), sections (7), (9) and (3)(B) and (D) do not mention the Settlement Fund. Moreover, the title of subsection (b) refers to topics other than "[e]xpending of [the] Fund," indicating that the subsection does not relate exclusively to use of Settlement Fund monies. Indeed, the broad, unqualified reference in the subsection title to "acquisition of land and natural resources" supports the plaintiffs' position that Congress intended the subsection to address any acquisition of land and natural resources by or for the Tribe.[12]

Because the text of the statute is ambiguous, examination of other indicia of statutory meaning is necessary. *See, e.g., United States v. LaPorta,* 46 F.3d 152, 156 (2nd Cir.1994) ("when the text proves to be ambiguous, we will turn to other sources to divine Congress' intent"); *Cusanelli v. Klaver,* 698 F.2d 82, 86 (2nd Cir.1983); *Blum v. Stenson,* 465 U.S. 886, 896, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984).[13] When other aids to statutory

---

**12.** That subsection (b) was intended to address topics unrelated to the Settlement Fund is further supported by reference to the legislative history. The report of the Select Senate Committee on Indian Affairs that accompanied the legislation stated in regard to subsection (b) generally: "Section [1754](b) establishes the terms under which the settlement fund is to be admin-

istered. This subsection *contains several further subdivisions.*" S.Rep. No. 98–222, 98th Cong., 1st Sess. 5 (1983) (emphasis added).

**13.** Even if § 1754(b)(8) were not ambiguous, the "literal meaning" urged by defendants would not be determinative. Reliance upon "other evidence of Congressional intent" is appropriate—

construction are considered, it becomes apparent that plaintiff's interpretation of the statute is correct. The legislative history of § 1754(b)(8),[14] the relationship between § 1754(b)(8) and other provisions of the statute,[15] and the purpose of the statute,[16] all indicate that the drafters intended § 1754(b)(8) to bar the Secretary from accepting into trust for the Tribe land located outside the "settlement lands" as defined in § 1752 of the Act, regardless of the source of the purchase money.

The legislative history of § 1754(b)(8) strongly indicates that plaintiffs' interpretation is correct. Two items from the legislative history are particularly important in this regard: the report of the Senate Select Committee on Indian Affairs, and the report of the House Committee on Interior and Insular Affairs. The two reports contain identical statements regarding § 1754(b)(8). They state:

*Section [1754](b)(8) specifically provides that lands not falling within the definition of 'settlement lands' are to be held in fee by the Mashantucket Pequot Tribe and are not to be taken in trust by the United States. It provides further that the United States shall have no trust responsibility with respect to those lands. Finally, the subsection provides that these lands will not be subject to any restraint against alienation imposed by the laws of the United States.*

S.Rep. No. 98–222, 98th Cong., 1st Sess. 14 (1983); H.Rep. No. 98–43, 98th Cong., 1st Sess. 9 (1983) (emphasis added). These statements describe the provision as disqualifying from trust status all tribal land other than settlement lands.

In addition, both the House and the Senate reports state that "[a]ny lands that may be acquired as part of an approved economic development plan that do not satisfy the definition of settlement lands set forth in subsection [1752(4)] are not to be taken in trust for the Tribe." S.Rep. No. 98–222, 98th Cong., 1st Sess. 14 (1983); H.Rep. No. 98–43, 98th Cong., 1st Sess. 9 (1983). The parties have not represented to the court that the lands at issue have been acquired "as part of an approved economic development plan." Nevertheless, this passage constitutes a relevant indicator of legislative intent because it illuminates Congress' intention to prohibit the taking into trust of land outside the settlement lands purchased without Settlement Fund monies. It is reasonable to assume that Congress, unable to foresee the wealth the Tribe would eventually achieve through its casino operations and related enterprises, believed that the Tribe's economic activities would remain subject to such a plan.[17] It is therefore appropriate to infer from this passage a generalized intent that

14. *See Salute v. Stratford Greens Garden Apartments,* 136 F.3d at 297 (referring to legislative report in order to determine intentions of drafters); *U.S. v. Skinner,* 946 F.2d 176, 178 (2nd Cir.1991) (indicating in dicta that where legislative history contradicts language of statute, even indeed it is necessary—when the literal meaning of a text produces a result that is "difficult to fathom." *Public Citizen v. United States Department of Justice,* 491 U.S. 440, 454, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989) (Brennan, J.). In addition, "[t]he plain meaning of a statute may not be controlling in those rare cases when 'literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'" *Salute v. Stratford Greens Garden Apartments,* 136 F.3d 293, 297 (2nd Cir.1998) (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1313 (2nd Cir.1995)). In this case, the defendants' literal interpretation of § 1754(b)(8) would produce results that cannot be reconciled with other significant indicators of statutory meaning.

unambiguous language, construction that deviates from language is permissible).

15. *See United States Nat'l Bank of Oregon v. Independent Ins. Agents of America, Inc.,* 508 U.S. 439, 454–455, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993) (Souter, J.) ("Over and over we have stressed that in expounding a statute, [courts] must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.... Statutory construction is a holistic endeavor, and, at a minimum, must account for a statute's full text, ... structure, and subject matter." [Citations and internal quotation marks omitted.]).

16. *Id.*

17. The Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.,* which permits Indian tribes to operate casinos, was enacted in 1988. The Tribe was authorized to conduct casino operations in 1991. 56 Fed.Reg. 24996 (1991).

land outside the settlement lands would not be taken into trust for the Tribe.

■ The relationship between § 1754(b)(8) and other provisions of the statute bolsters the conclusion that plaintiffs' interpretation is correct and defendants' is incorrect. First, if § 1754(b)(8) has the meaning defendants ascribe to it, it is superfluous in light of § 1754(b)(5). Section 1754(b)(5) mandates that the United States shall have no trust responsibility for any property purchased with Settlement Fund money except for settlement lands so acquired. Thus, were § 1754(b)(8) interpreted as defendants urge—as meaning that the United States shall have no trust responsibility for any property purchased with Settlement Fund money and located outside of the settlement lands—it would add nothing beyond the command of § 1754(b)(5). In contrast, construed as a prohibition on the exercise of the Secretary's § 465 authority with respect to all land acquired by or for the Tribe outside the settlement lands, regardless of means of purchase, § 1754(b)(8) expresses a rule that has not already been clearly articulated elsewhere in the statute. In general, courts assume that Congress intended the words it used to have meaning; statutory constructions that create redundancies are disfavored. *See, e.g., In re Mazzeo,* 131 F.3d 295, 302 (2nd Cir.1997); *Triestman v. United States,* 124 F.3d 361, 376 (2nd Cir.1997); *Carey v. New York Gaslight Club,* 598 F.2d 1253, 1257 n. 6 (2nd Cir.1979).

The propriety of plaintiffs' interpretation of the phrase "acquired under this subsection" in § 1754(b)(8) is further reinforced by reference to § 1754(b)(7), which contains precisely the same phrase. Given the identical wording of the phrase in each provision, and the juxtaposition of the two provisions, one must conclude that the phrase has the same meaning in each provision. If plaintiffs' interpretation of the phrase is adopted, § 1754(b)(7) constitutes a mandate that all land acquired by or for the Tribe within the boundaries of the settlement lands must be held in trust by the federal government, regardless of the means of acquisition. This construction gives effect to Congress' intention to create a reservation incorporating any and all settlement lands that could be acquired by or for the Tribe. *See* 25 U.S.C. § 1752(3), (4) and (7); S.Rep. 98–222, 98th Cong. 1st Sess. 14 (1983). In contrast, if defendants' interpretation of the phrase "acquired under this subsection" were adopted, § 1754(b)(7)'s requirement that settlement lands "shall be" taken into trust would extend only to lands acquired with Settlement Fund money, the Secretary would be free in the exercise of his § 465 discretion to refuse to take into trust settlement lands purchased with other money, and such land would be ineligible for reservation status.[18]

Consideration of the purpose of the Act also supports plaintiffs' interpretation of § 1754(b)(8) as barring trust acquisition of any land located outside the settlement lands. All parties acknowledge that "[t]he purpose of [the legislation was] to provide Congressional ratification and implementation of a settlement of claims … raised by the Mashantucket Pequot Tribe" in its Nonintercourse Act lawsuit filed in 1976. S.Rep. No. 98–222, 98th Cong., 1st Sess. 5 (1983); *see also* 25 U.S.C. § 1751. However, each side's interpretation presupposes vastly dif-

---

18. In addition, section 1754(b)(8), as interpreted by plaintiffs, in conjunction with sections 1754(b)(7) and 1757(a), helps to establish a sensible, comprehensive trust scheme. As described in the text, pursuant to § 1754(b)(7), land located within the settlement lands is to be taken into trust for the Tribe, regardless of the source of the purchase money. The United States has a trust responsibility with regard to the original, State-recognized reservation—which has been incorporated into the new reservation, along with the settlement lands taken into trust, § 1752(7)—because that land, although technically held in fee, is subject to restrictions against alienation pursuant to § 1757(a) and the Nonintercourse Act, 25 U.S.C. § 177. *See* S.Rep. No. 98–222, 98th Cong., 1st Sess. 14 (1983) ("The present reservation of the Tribe, which is currently held in fee simple, will retain that status. Under section [1757(a)], however, the present reservation of the Tribe shall be subject to a federal restraint against alienation and, for this reason, the United States will have a trust responsibility to the present reservation.") Thus, all the land designated for reservation status by § 1752(b)(7) is to be taken into trust by the federal government, whereas, pursuant to § 1754(b)(8), land located outside the area designated for reservation status must be held in fee and may not be taken into trust.

ferent views of the nature of the settlement agreement.

Plaintiffs view the statute as providing a final, consensual settlement of a broad range of issues between the State and the Tribe, including competing claims of territorial sovereignty. Under this view of the statute, the Secretary may not expand the Tribe's territorial sovereignty beyond the boundaries of the settlement lands, as demarcated in the Settlement Act, over the objection of the State. In contrast, defendants view the statute as providing a final settlement only with regard to the Tribe's claims to aboriginal title. Under this view, the Act places no limits on the Secretary's authority to expand the scope of the Tribe's territorial sovereignty, at the expense of the sovereignty of the State and its municipal subdivisions, by taking land into trust under § 465.[19]

The court concludes that plaintiffs' view of the purpose of the Act is correct. The legislative record shows that settlements of Indian land claims typically address far more than the aboriginal claims alleged in the underlying lawsuit. According to a Senate staff memorandum incorporated into the record of the last hearing on the bill that became the Settlement Act, settlements of Indian land claims usually provide a broad final settlement encompassing issues of territorial sovereignty and jurisdiction:

> In negotiating the Nonintercourse Act claims, the parties bargain for an arrangement with which they can live in the future. The Tribes typically negotiate for a land base and a settlement fund sufficient to promise a stable cultural and economic future. The State negotiates for an appropriate jurisdictional authority over the tribe and its land, the preservation of the property tax base, and so forth. The settlement in the end usually bears little relation to the positions set forth in the initial complaints and answers in the [underlying] case.

*Staff Memorandum—The Veto of S.366. The Mashantucket Pequot Indian Claims Settlement Act, in Mashantucket Pequot Indian Land Claims: Hearing on S.1499 Before the Senate Comm. on Indian Affairs*, 98th Cong., 1st Sess. 32 (1983).

The Settlement Act conformed to this typical pattern. The Act contains a complex, detailed definition of the scope of the Tribe's reservation, 25 U.S.C. §§ 1752(3), (4) and (7), and explicitly delineates the outer limits of the area in which the Tribe can expand its territorial sovereignty through purchases of land that can be taken into trust for the Tribe. *Id.* § 1752(3). The Act also defines a unique form of jurisdiction over the Tribe's reservation, declaring it to be "Indian country," but subjecting it "to State jurisdiction to the maximum extent provided by [25 U.S.C. § 1321 *et seq.*]." *Id.* § 1755. This intricate arrangement bespeaks a careful compromise regarding the nature and scope of the Tribe's territorial sovereignty.

It is unreasonable to suppose that the parties negotiated a settlement to include these arrangements and yet intended to allow the Secretary to take into trust for the benefit of the Tribe any and all land acquired by the Tribe in the future, as long as the land was not purchased with Settlement Fund money.

**19.** Defendants maintain that the only limitation on the Secretary's discretion to take land into trust for the Tribe is the regulatory requirement that the Secretary's decision take account of the factors enumerated in 25 C.F.R. § 151.10. Those factors require the Secretary to consider "(a) The existence of statutory authority for the acquisition and any limitations contained in such authority; (b) The need of the ... tribe for additional land; (c) The purposes for which the land will be used; ... (e) If the land to be acquired is in unrestricted fee status, the impact on the State and its political subdivisions resulting from the removal of the land from the tax rolls; (f) Jurisdictional problems and potential conflicts of land use which may arise; and (g) If the land to be acquired is in fee status, whether the Bureau of Indian Affairs is equipped to discharge the additional responsibilities resulting from the acquisition of the land in trust status." Defendants have acknowledged that the rationale for the proposed trust acquisition—providing the Tribe with a stable land base protected by a federal restraint against alienation—would justify future trust acquisitions of other land. Asked at oral argument to specify the outer limit of the Secretary's authority to take more land into trust for the Tribe, defendants could state only that at some point, "[p]rior to the acquisition of all of southeastern Connecticut," it would "be unreasonable for the Secretary to find that he had rationally considered" the regulatory criteria. Transcript, November 24, 1997, at 70.

Trust acquisitions of parcels located outside the settlement lands defined in the Act would undermine the arrangement worked out by the Tribe and the State and approved by Congress. Such acquisitions would enable the Tribe to expand the geographical scope of its sovereignty beyond that contemplated by the Act.[20] Moreover, the Tribe would have greater autonomy with regard to those parcels than it has within the reservation defined by the statute. The statute's grant of "State jurisdiction [over the reservation] to the maximum extent provided in [25 U.S.C. § 1321 *et seq.*]," *id.* § 1755—which has been understood to confer upon the State full civil and criminal jurisdiction over the reservation, *Charles v. Charles*, 243 Conn. 255, 701 A.2d 650 (1997), *cert. denied,* — U.S. —, 118 S.Ct. 1838, 140 L.Ed.2d 1089 (1998); *State v. Spears*, 234 Conn. 78, 662 A.2d 80, *cert. denied,* 516 U.S. 1009, 116 S.Ct. 565, 133 L.Ed.2d 490 (1995)—would not apply in any areas taken into trust beyond the settlement lands.[21] Instead, the usual jurisdictional consequences of trust status, which are more preclusive of state authority, would obtain.[22]

It is far more likely that the parties intended to negotiate an agreement that would preserve the significance of the jurisdictional arrangement that they had worked out with the assistance of the federal government. Accordingly, the court is persuaded that the statute was intended to embody such a settlement. Plaintiffs' interpretation of § 1754(b)(8) as barring trust acquisitions beyond the settlement lands, regardless of the source of the purchase money, gives effect to that purpose, further reinforcing the conclusion that plaintiffs' interpretation is correct.

■ The defendants contend that the interpretation of the Department of the Interior, as the agency charged with administration of the statute, deserves deference. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ("if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute"). However, the deference normally accorded agency constructions of ambiguous statutory

**20.** If defendants' interpretation of § 1754(b)(8) were adopted, and the Secretary took the land at issue into trust, the amount of land under the jurisdiction of the Tribe would increase substantially, notwithstanding the limits the drafters of the Settlement Act placed on the geographic scope of the Tribe's sovereignty through § 1752. According to an internal Department of Interior memorandum, as of 1995, the settlement area consisted of 1228 acres held in trust, 255 acres held in fee by the Tribe, and 796 acres held in fee by non-Indians. Memorandum from the Acting Area Director of the BIA, Eastern Area, to the Acting Deputy Commissioner for Indian Affairs, dated January 27, 1995, *in* Administrative Record, I–W–5–6. Based on those figures, the pending trust acquisition of approximately 165 acres would place under the jurisdiction of the Tribe roughly eleven percent more land than it now controls within the settlement lands, and roughly seven percent more than the total potential acreage of the reservation.

**21.** *See* memorandum accompanying notice of final agency determination, State's brief dated May 23, 1996, Appendix A, p. 10, designated by the Secretary as part of the Administrative Record ("The Settlement Act grants civil and criminal jurisdiction to the State of Connecticut. However, since these parcels are outside of the settlement area and being converted into trust under the authority of the IRA, we see no need to grant jurisdiction to the state."); *see also* Administrative Record, I–AD–6. There seems to be no

prospect that the lands might be designated as part of the reservation, and thereby come under the jurisdiction of the State pursuant to § 1755. The Department of the Interior has determined that the definition of the reservation in § 1752(7) supersedes the Secretary's general authority under 25 U.S.C. § 467 to confer reservation status upon newly acquired lands beyond the settlement lands. Memoranda from Roger Sumner Babb, Regional Solicitor, Southeast Region, to Bill D. Ott, Area Director, Eastern Area, BIA, dated May 30, 1990 and June 1, 1992, *in* Administrative Record, IX–C–D.

**22.** As noted earlier, land taken into trust under § 465 is insulated from state and local control in at least three important respects: (1) trust lands are considered "Indian country," *Citizen Band Potawatomi Indian Tribe of Oklahoma,* 498 U.S. at 511, 111 S.Ct. 905, and, accordingly are removed from state civil and criminal jurisdiction, unless the tribe consents to such jurisdiction, 25 U.S.C. §§ 1321, 1322; (2) trust lands are exempt from state and local taxation, 25 U.S.C. § 465; and (3) trust lands are exempt from state and local land use regulation, in the absence of a specific dispensation from the Secretary, which is to be based upon "the best interest of the Indian owner or owners." 25 C.F.R. § 1.4; *see also Santa Rosa Band of Indians,* 532 F.2d at 664–66 (9th Cir.1975).

text is inappropriate in this case for several reasons.

First, "[i]n order for an agency interpretation to be granted deference, it must be consistent with the congressional purpose." *Morton v. Ruiz,* 415 U.S. 199, 237, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974). "The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent.... If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." (Citations omitted.) *Chevron,* 467 U.S. at 843 n. 9, 104 S.Ct. 2778; *see also Lawrence County v. Lead–Deadwood Sch. Dist. No. 40–1,* 469 U.S. 256, 262, 105 S.Ct. 695, 83 L.Ed.2d 635 (1985) ("[t]he interpretation of an agency charged with the administration of a statute is entitled to substantial deference ... if it is not inconsistent with the legislative history"). In this case, although the statutory text is ambiguous, traditional tools of statutory construction nevertheless reveal Congress' intention, and defendants' interpretation is inconsistent with that intention.

Second, the agency gave two conflicting opinions regarding the meaning of § 1754(b)(8) within a two year period, originally adopting the position currently advocated by the plaintiffs, and then, after receiving a request for reconsideration from the Tribe, adopting the defendants' current interpretation.[23] "An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is entitled to considerably less deference than a consistently held agency view." *INS v. Cardoza–Fonseca,* 480 U.S. 421, 446 n. 30, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) (internal quota-

tion marks omitted); *see also Watt v. Alaska,* 451 U.S. 259, 273, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981); *Morton v. Ruiz,* 415 U.S. at 237, 94 S.Ct. 1055.

Third, § 1754(b)(8) constitutes an explicit prohibition on certain agency action. When "courts [are] construing [provisions of] statutes enacted specifically to prohibit agency action," less deference to the interpretation of the agency is warranted. *Independent Ins. Agents of America, Inc. v. Board of Governors of Federal Reserve System,* 838 F.2d 627, 632 (2nd Cir.1988).

Defendants also claim that a decision in their favor is required by two canons of statutory construction. The first is the general rule that "when two statutes are capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Morton v. Mancari,* 417 U.S. 535, 551, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974). This rule applies when a proffered interpretation of a statute would place the statute in direct conflict with another statute, requiring the conclusion that one statute implicitly repealed the other. *See, e.g., id.* at 549–51, 94 S.Ct. 2474. Plaintiffs' interpretation of § 1754(b)(8) poses no such difficulty. A construction of the Settlement Act that prohibits the Secretary from taking into trust lands located outside the settlement lands does not require a conclusion that § 465 has been repealed. Rather, that interpretation merely carves out an exception to the general rule of § 465, in keeping with the principle of statutory interpretation that "[o]rdinarily, where a specific provision conflicts with a general one, the specific governs." *Edmond v. United States,* 520 U.S.

---

**23.** In December 1987, the Tribe formally requested the Department of the Interior to take into trust lands beyond the settlement lands that were purchased with non-Settlement Fund monies. In response to a request from the Area Director of the BIA, in January 1988, the Regional Solicitor of the BIA issued a formal opinion interpreting § 1754(b)(8) as plaintiffs now propose, commenting, "The contours of the Act are immediately apparent." Memorandum from BIA Regional Solicitor Roger Sumner Babb to BIA Area Director Bill D. Ott, Jan. 28, 1988, in

Administrative Record, IX–A. After the Tribe expressed concern regarding the matter, the Area Director asked the Regional Solicitor to reconsider. The Regional Solicitor reversed his position. His second opinion, dated May 30, 1990, adopts the interpretation now urged by the defendants. *See* Administrative Record, IX–A–C; Plaintiff Towns and State of Connecticut's Joint Statement of Material Facts Not in Dispute [doc. # 70], p. 6; Defendants' Response [doc. # 99], pp. 4–5.

651, 657, 117 S.Ct. 1573, 137 L.Ed.2d 917 (1997).

Second, defendants rely on the principle that "statutes passed for the benefit of dependent Indian tribes or communities are to be liberally construed, doubtful expressions being resolved in favor of the Indians." *Alaska Pacific Fisheries v. United States,* 248 U.S. 78, 89, 39 S.Ct. 40, 63 L.Ed. 138 (1918); *see also, e.g., Montana v. Blackfeet Tribe of Indians,* 471 U.S. 759, 766, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985). Plaintiffs contend that this principle, which is premised on the need to protect "weak and defenseless people who are the wards of the nation, dependent upon its protection and good faith," *McClanahan v. Arizona State Tax Commission,* 411 U.S. 164, 174, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973), does not apply to disputes involving wealthy tribes, like the Mashantucket Pequots.[24] There is no need to resolve that question because this canon of construction, even when appropriately applied, will not defeat a construction based on a proper analysis of congressional intent. "In all case[s], the face of the Act, the surrounding circumstances, and the legislative history are to be examined with an eye toward determining what congressional intent was." (Internal quotation marks omitted.) *Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584, 587, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977). Analysis based on those factors demonstrates that § 1754(b)(8) prohibits the Secretary from exercising his § 465 authority with respect to land outside the settlement lands.

In light of the foregoing, the interpretation of § 1754(b)(8) offered by the defendants cannot withstand scrutiny. The text of the statute, the structure of the statute as a whole, the purpose of the statute and the legislative history compel the conclusion that Congress intended § 1754(b)(8) to prohibit the Secretary from taking into trust for the benefit of the Tribe land located outside the settlement lands as defined in § 1752, regardless of the source of funds used to purchase the land. Because the land at issue is located outside the settlement lands, § 1754(b)(8) prohibits the Secretary from taking it into trust.

Accordingly, the Secretary's decision to take the land into trust is "unlawful," 5 U.S.C. § 706(2), and must be set aside. *See id.,* § 706(2)(c) ("[t]he reviewing court shall (2) hold unlawful and set aside agency action, findings, and conclusions found to be … in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"); *Citizens Committee for Hudson Valley v. Volpe,* 425 F.2d 97, 102 (2nd Cir.1970) ("[t]he district court has the power under 706 to set aside agency action in excess of statutory authority"). If the Tribe and the defendants wish to proceed with the proposed transfer of title to lands outside the settlement lands, they must seek congressional approval.

Plaintiffs' motions for summary judgment are granted. Defendants' summary judgment motion is denied. The court hereby declares that the Secretary's decision to take the parcels of land at issue into trust for the benefit of the Tribe violates the Settlement Act, 25 U.S.C. § 1754(b)(8), and the Secretary is hereby permanently enjoined from taking those parcels into trust.

---

24. The administrative record hints at the economic power the Tribe has achieved through its successful gaming operations and associated enterprises. The Department of the Interior's internal memorandum recommending approval of the trust acquisition at issue in this case states:

> The infra-structure and economic development projects taking place on the reservation have produced an annual construction payroll of approximately forty million dollars. The Foxwoods Casino employs approximately 9,500 people with an annual payroll in the vicinity of two hundred million dollars. Most of these employees live locally, including several hundreds in the towns of North Stonington and Ledyard. Each employee receives an excellent benefit plan, including full medical, dental, eye care, and pharmaceutical benefits. The current projects [generate] an incalculable 'spinoff' to local businesses generated by the tribe's economic development activities.... The tribe has not requested that their hotel (adjacent to the settlement area) be placed into trust. This results in the payment of $400,000 per year in property taxes to the Town of Ledyard....

Memorandum from the Director of the Office of Trust Responsibilities to Ada E. Deer, Assistant Secretary for Indian Affairs, May 1, 1995, *in* Administrative Record, I–AD–4–5.