State of **CONNECTICUT, ex rel. Richard BLUMENTHAL, Attorney General; Town of Ledyard, Town of North Stonington, Town of Preston, Plaintiffs–Appellees,**

v.

**THE UNITED STATES DEPARTMENT OF THE INTERIOR; Bruce Babbitt, Secretary of the Interior; Kevin Gover, Assistant Secretary of the Interior for Indian Affairs; Franklin Keel, Eastern Area Director, Bureau of Indian Affairs, Defendants–Appellants.**

**Docket No. 99–6042.**

United States Court of Appeals, Second Circuit.

Argued: Jan. 6, 2000

Decided: Sept. 25, 2000

Benjamin S. Sharp, Guy R. Martin, Donald C. Baur, Perkins Coie LLP, Washington, D.C., for Plaintiffs–Appellees, Towns of Ledyard, North Stonington, and Preston.

Richard Blumenthal, Attorney General for the State of Connecticut; Joseph Rubin, David H. Wrinn, Assistant Attorneys General, Hartford, CT, for Plaintiff–Appellee State of Connecticut.

M. Alice Thurston, Roger Martella, Elizabeth Ann Peterson, United States Department of Justice Environmental & Natural Resources Division, Washington, D.C.; Stephen C. Robinson, United States Attorney; Peter Coppelman, Acting Assistant Attorney General; John B. Hughes, Assistant United States Attorney, New Haven, CT, (David Etheridge, Maria Wiseman, Department of the Interior, Washington, D.C., of counsel) for Defendants–Appellants.

Patrice H. Kunesh, Office of Legal Counsel, Mashantucket Pequot Tribe, Mashantucket, CT, Elizabeth Conway, Brown, Jacobson, Tillinghast, Lahan & King, P.C., Norwich, CT, (Jackson T. King, Jr. on the brief) for amicus curiae Mashantucket Pequot Tribe.

Before: KEARSE, WALKER, and CALABRESI, Circuit Judges.

JOHN M. WALKER, JR. Circuit Judge:

Defendants-appellants, the United States Department of the Interior; Bruce Babbitt, Secretary of the Interior; Kevin Gover, Assistant Secretary of the Interior for Indian Affairs; and Franklin Keel, Eastern Area Director, Bureau of Indian Affairs (collectively, the "defendants" or the "federal defendants") appeal from a December 16, 1998 judgment of the United States District Court for the District of Connecticut (Robert N. Chatigny, *District Judge*) denying their motion for summary judgment and granting the summary judgment motion of plaintiffs-appellees State of Connecticut, Town of Ledyard, Town of North Stonington, and Town of Preston (collectively, the "plaintiffs" or the "Connecticut plaintiffs"). The district court permanently enjoined the Secretary of the Interior from taking land into trust on behalf of the Mashantucket Pequot Tribe of Indians on grounds that it would violate 25 U.S.C. § 1754(b)(8). The material facts are not in dispute.

## BACKGROUND

In January 1993, the Mashantucket Pequot Tribe of Indians (the "Tribe" or the "Mashantucket Pequots") applied to the Secretary of the Interior (the "Secretary") to have 165 acres of land presently owned by the Tribe in fee taken into trust for their benefit, pursuant to the Indian Reorganization Act, 25 U.S.C. § 461 *et seq.* ("the IRA"). Exercising his discretion pursuant to 25 U.S.C. § 465, and after applying the criteria set forth in 25 C.F.R. § 151.10, the Secretary agreed to take the land into trust in May, 1995. The Connecticut plaintiffs brought this lawsuit to block the Secretary's action and the Secretary deferred taking title to the land pending the outcome.

The plaintiffs' suit, under the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. § 702, seeks: (1) a declaration that the Secretary's actions violate the Connecticut Indian Land Claims Settlement Act (the "Settlement Act"), 25 U.S.C. §§ 1751–60; and (2) an order permanently enjoining the Secretary from taking the contested land into trust. The federal defendants argue that the Secretary's decision to take the land into trust was a valid exercise of his authority under § 465 of the IRA. On cross-motions for

summary judgment, the district court, upon a determination that the Settlement Act prohibited the Secretary's action, permanently enjoined the Secretary from taking the contested 165 acres of land into trust for the Tribe's benefit. This appeal followed.

Underlying the present dispute in part is the remarkable reversal of fortune that the Mashantucket Pequots have enjoyed in recent years. When the Settlement Act was enacted in 1983, the Tribe was impoverished, with no obvious future source of revenue in sight. All of that changed dramatically in 1990 when the Tribe applied to conduct Class III gaming activities on its reservation, pursuant to the newly-enacted Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq. See Mashantucket Pequot Tribe v. Connecticut,* 913 F.2d 1024, 1025–28 (2d Cir.1990) (describing the Tribe's application process and requiring Connecticut to enter into good faith negotiations with the Tribe to create a tribal-state compact). In less than a decade the approximately 300–member Mashantucket Pequot Tribe developed one of the most profitable casinos in the United States, the Foxwoods Resort Casino in Ledyard, Connecticut, grossing nearly $1 billion annually. *See* Julian Schriebman, *Developments in Policy: Federal Indian Law,* 14 Yale L. & Pol'y Rev. 353, 361 nn. 62–63 (1996).

The stakes are considerable for both sides. The tax revenues that plaintiffs will forgo have been estimated at $50,000 annually if the Tribe adheres to its stated intention to leave the 165 acres of land at issue in this case undeveloped. But if the Tribe develops the property, as plaintiffs suspect it might, the tax revenues annually forgone by one or more of these Connecticut plaintiffs could be in the several hun-

dreds of thousands of dollars. The Connecticut plaintiffs are also concerned that an adverse ruling in this case will affect other lands that the Tribe owns or may acquire in the future. Although not directly at issue in this proceeding, the Tribe has applied to the Secretary to have an additional 1,200 acres of non-settlement land taken into trust.

## DISCUSSION

■ We must begin with a brief description of the relevant statutes in order to frame the present dispute. Enacted in 1934, the IRA fundamentally restructured the relationship between Indian tribes and the federal government, reversing the Nineteenth Century goal of assimilation and embodying "principles of tribal self-determination and self-governance." *See County of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation,* 502 U.S. 251, 255, 112 S.Ct. 683, 116 L.Ed.2d 687 (1992). Relevant to this appeal, the IRA authorizes the Secretary to take certain lands into trust for the benefit of an Indian tribe. *See* 25 U.S.C. § 465. The procedures governing the Secretary's exercise of discretion in this regard are set forth in Department of Interior regulations. *See* 25 C.F.R. Part 151;[1] *see generally* Mary Jane Sheppard, *Taking Indian Land Into Trust,* 44 S.D. L.Rev. 681 (1999) (describing the process by which Indian tribes may apply to have property taken into trust).

When the Secretary takes land into trust on behalf of a tribe pursuant to the IRA, several important consequences follow. Land held in trust is generally not subject to (1) state or local taxation, *see* 25 U.S.C. § 465; (2) local zoning and regulatory requirements, *see* 25 C.F.R. § 1.4(a);

---

**1.** The Secretary must consider, among other things, "(b) The need of the individual Indian or the tribe for additional land; (c) The purposes for which the land will be used; (d) If the land is to be acquired for an individual Indian, the amount of trust or restricted land already owned by or for that individual and the degree to which he needs assistance in handling his affairs; (e) If the land to be acquired is in unrestricted fee status, the impact on the State and its political subdivisions resulting from the removal of the land from the tax rolls; [and] (f) Jurisdictional problems and potential conflicts of land use which may arise." 25 C.F.R. § 151.10.

or, (3) state criminal and civil jurisdiction, unless the tribe consents to such jurisdiction, *see* 25 U.S.C. §§ 1321(a), 1322(a).

The Connecticut plaintiffs pin their hopes on the Settlement Act which, they argue, prevents the Secretary from taking into trust certain land, like the 165 acres here. The Settlement Act was the consequence of a 1976 lawsuit filed by the Tribe, long before it had any notion that it would become a casino owner, asserting title to several hundred acres of land in and around Ledyard, Connecticut. In that action, the Tribe claimed that in 1855 Connecticut had transferred nearly 800 acres of Tribe-owned land out of tribal hands without congressional approval, in violation of the Nonintercourse provisions of the Trade and Intercourse Act of 1790 (now codified at 25 U.S.C. § 177). *See* H.R.Rep. No. 98–43, at 2–3 (1983). The immediate effect of the 1976 lawsuit was to place a cloud on the title to hundreds of acres of privately and publicly owned land in Connecticut and to threaten to bring about many years of protracted litigation. The parties to the lawsuit negotiated a tentative settlement that included federal recognition of the Tribe, which would permit land to be taken into trust by the Secretary. Accordingly, an act of Congress was required to implement the terms of the settlement. On October 18, 1983, Congress enacted the Settlement Act to embody the agreement reached by the parties.[2]

The Settlement Act extinguished the Tribe's claims to hundreds of acres of land. *See* 25 U.S.C. § 1753. In exchange, the Settlement Act: (1) provided for federal recognition of the Tribe, *see id.* § 1758; (2) established a $900,000 fund (the "settlement fund"), designed principally for the purchase of private property, *see id.* § 1754; and (3) identified boundaries within which lands acquired by the Tribe would be held in trust by the Secretary and would constitute the Tribe's reservation, the so-called settlement lands, *see id.* §§ 1752(3), (4) & (7).

The Settlement Act distinguished between various types of property, however, and these distinctions form the basis for the present controversy. In relevant part, the Settlement Act provides the following definitions:

> (3) The term "private settlement lands" means—
>
> (A) the eight hundred acres, more or less, of privately held land which are identified by a red outline on a map filed with the secretary of the State of Connecticut in accordance with the agreement referred to in section 1751(d) of this title, and
>
> (B) the lands known as the Cedar Swamp which are adjacent to the Mashantucket Pequot Reservation as it exists on October 18, 1983 . . . .
>
> (4) The term "settlement lands" means—
>
> (A) the lands described in sections 2(a) and 3 of the Act To Implement the Settlement of the Mashantucket Pequot Indian Land Claims as enacted by the State of Connecticut . . . and
>
> (B) the private settlement lands.

25 U.S.C. §§ 1752(3) & (4). The Act also defines "reservation" to mean "the existing reservation of the Tribe . . . and any settlement lands taken in trust by the United States for the Tribe." *Id.* § 1752(7). Essentially, then, the Settlement Act describes—and even expressly references—a map depicting the Tribe's pre-settlement

---

2. Congress has, at various times, provided legislative remedies for similar disputes throughout the country. *See* Rhode Island Indian Claims Settlement, 25 U.S.C. §§ 1701–12; Maine Indian Claims Settlement, 25 U.S.C. §§ 1721–35; Florida Indian (Miccosukee) Land Claims Settlement, 25 U.S.C. §§ 1741–50e; Massachusetts Indian Land Claims Settlement, 25 U.S.C. §§ 1771–71i; Washington Indian (Puyallup) Land Claims Settlement, 25 U.S.C. §§ 1773–73j; Seneca Nation (New York) Land Claims Settlement, 25 U.S.C. §§ 1774–74h; Mohegan Nation (Connecticut) Land Claims Settlement, 25 U.S.C. §§ 1775–75h; Crow Boundary Settlement, 25 U.S.C. §§ 1776–76k.

reservation, and the publicly and privately owned land surrounding the reservation that comprises the settlement lands.

The Settlement Act contemplates that the Secretary would, at the request of the Tribe, use money from the $900,000 settlement fund to purchase additional land on behalf of the Tribe. *See id.* § 1754. The trust status of such acquisitions depends, at least in part, on the location of the purchased property. At the heart of the present controversy, under the title, "Mashantucket Pequot Settlement Fund," the Settlement Act provides, in relevant part:

(b) *Expending of Fund; private settlement lands; economic development plan; acquisition of land and natural resources*

. . . . .

(5) As the Fund or any portion thereof is disbursed by the Secretary in accordance with this section, the United States shall have no further trust responsibility to the Tribe or its members with respect to the sums paid, any subsequent expenditures of these sums, or any property other than private settlement lands or services purchased with these sums.

. . . . .

(7) Lands or natural resources acquired under this subsection which are located within the settlement lands shall be held in trust by the United States for the benefit of the Tribe.

(8) Land or natural resources acquired under this subsection which are located outside of the settlement lands shall be held in fee by the Mashantucket Pequot Tribe, and the United States shall have no further trust responsibility with respect to such land and natural resources. Such land and natural resources shall not be subject to any restriction against alienation under the laws of the United States.

25 U.S.C. §§ 1754(b)(5), (7) & (8) (hereinafter, "§ (b)(5)," "§ (b)(7)," and "§ (b)(8)," respectively).

The general purpose of the Settlement Act is plain. After defining the land comprising the Indian's reservation, the Settlement Act provides a mechanism whereby the Mashantucket Pequot tribe is able to add property to its reservation. This much is undisputed by the parties: private settlement lands—lands acquired within the area defined in the Settlement Act— that are acquired with settlement funds are to be held in trust by the Secretary; non-settlement lands acquired with settlement funds are to be held in fee by the Tribe and the United States shall have no further trust responsibility with respect to such land. The property at issue in this case, however, falls outside the settlement lands and has been acquired by the Tribe without the use of settlement funds. The question, then, is whether § (b)(8) proscribes the Secretary from taking into trust lands that are outside the area demarcated as settlement lands, whether or not purchased with settlement funds, or whether § (b)(8) prohibits only the taking into trust of non-settlement lands that are purchased with settlement funds.

■ On cross-motions for summary judgment, the district court agreed with the Connecticut plaintiffs that § (b)(8) prohibits the Secretary from taking non-settlement lands purchased with non-settlement funds into trust for the benefit of the Tribe. The district court held that the phrase, "acquired under this subsection," within § (b)(8), was ambiguous and, turning to the Act's legislative history, found that Congress intended the statute broadly to resolve the geographical limits of the Tribe's sovereignty. *Connecticut v. Babbitt*, 26 F.Supp.2d 397, 403–06 (D.Ct.1998). In holding for the Connecticut plaintiffs, the district court refused to apply the Indian canon of statutory construction, which requires that ambiguous statutes be interpreted to favor Indian tribes, *see infra* Part IV, and also refused to accord defer-

ence to the Department of the Interior's interpretation of the Settlement Act. *See Connecticut v. Babbitt*, 26 F.Supp.2d at 407–09. Contrary to the district court, we believe that the structure and language of the Settlement Act demonstrates that § (b)(8) applies only to land purchased with settlement funds. Insofar as ambiguity remains, moreover, every tool of statutory construction at our disposal favors the federal defendants' interpretation of the statute.

## I.

■ "In interpreting a statute, we begin with the language of the statute itself." *Tom Lange Co. v. Kornblum & Co. (In re Kornblum & Co.)*, 81 F.3d 280, 285 (2d Cir.1996) (internal quotation marks omitted). The Connecticut plaintiffs argue that the phrase "acquired under this subsection" means only "acquired by or for the Mashantucket Pequot Tribe," in which case § (b)(7) provides that "[l]ands · . . . located within the settlement lands shall be held in trust," and § (b)(8) provides that "land . . . located outside the settlement lands shall be held in fee." According to the Connecticut plaintiffs, the Settlement Act creates a blanket rule: lands outside the settlement lands cannot be taken in trust by the Secretary. The plaintiffs' interpretation, however, renders the phrase "acquired under this subsection" superfluous, and we are required to "disfavor interpretations of statutes that render language superfluous." *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992).

Reading § 1754 as a whole, we believe that the phrase "acquired under this subsection" in § (b)(8) is determinative of the statute's reach. Section 1754 is entitled "Mashantucket Pequot Settlement Fund," and section 1754(b) is entitled: "Expending of Fund; private settlement lands; economic development plan; acquisition of land and natural resources." These titles reflect the structure of the statute; § 1754 generally prescribes the use of the settle-

ment fund and the internal reference "acquired under this subsection" is logically read to mean "acquired with settlement funds."

This reading is confirmed by the phrase in § (b)(8) that "the United States shall have no *further* trust responsibility" over non-settlement lands. In order for the United States to have no "further" trust responsibilities, it must initially have ·had some trust responsibilities that are extinguished as to non-settlement lands. The source of those trust responsibilities is plain from the statute; it arises from the Secretary's trust responsibility over the settlement fund. It would be inconceivable for the United States to have no "further" trust responsibility under § (b)(8) unless the land had been purchased with settlement funds.

Accordingly, land acquired by the Tribe with settlement funds are either automatically taken into trust under § (b)(7) if they are within the boundaries of the settlement lands, or may not be taken into trust if outside those boundaries. The statute is silent with regard to lands, like the contested 165 acres here, not purchased with settlement funds. As to such lands, whether or not they are within settlement land boundaries, the Settlement Act does not apply. The Tribe may apply to the Secretary to take them into trust under the 1934 IRA, and the Secretary's decision will be governed by the considerations outlined in the relevant regulations. Nothing in § (b)(7) supplants the Secretary's power under the IRA to take into trust· lands acquired without the use of settlement funds.

■ The Connecticut plaintiffs insist that chapter titles must give way to the unambiguous meaning of the text. They argue that § (b)(7) is plain on its face and that reliance on the chapter title is therefore proscribed by canons of construction. *See Thistlethwaite v. Dowty Woodville Polymer, Ltd.*, 110 F.3d 861, 866 (2d Cir. 1997) ("Headings and titles are not meant

to take the place of the detailed provisions of the statutory text; nor are they necessarily designed to be a reference guide or a synopsis.") (internal quotation marks and alterations omitted). The short answer to the plaintiffs' argument is that our reliance is not on the title of § 1754, but rather on the structure of the statute. We do not need the chapter title to inform us that § 1754(b) generally governs the disposition of the settlement fund. The chapter title in this case provides a convenient referent for the subject of the statutory section but we do not rely on it to describe the subsection's content. Plaintiffs' criticism is therefore misplaced. Moreover, to the extent that the meaning of the phrase "acquired under this subsection" is ambiguous, resort to chapter titles, as well as to other tools of statutory interpretation, is appropriate. *See United States v. Roemer*, 514 F.2d 1377, 1380 (2d Cir.1975) (discussing *Brotherhood of R.R. Trainmen v. Baltimore & Ohio R.R.*, 331 U.S. 519, 528–29, 67 S.Ct. 1387, 91 L.Ed. 1646 (1947)).

Plaintiffs also contend that our interpretation of § (b)(8) renders § 1754(b)(5) surplusage. We disagree. Section (b)(5) provides that:

> As the Fund or any portion thereof is disbursed by the Secretary in accordance with this section, the United States shall have no further trust responsibility to the Tribe or its members with respect to the sums paid, any subsequent expenditures of these sums, or any property other than private settlement lands or services purchased with these sums.

The Connecticut plaintiffs argue that if, as we believe, § (b)(8) proscribes the Secretary from taking into trust only non-settlement land purchased with settlement funds, then § (b)(5) would be redundant when it provides that the Secretary shall have no trust responsibility over lands other than private settlement lands purchased with settlement funds. Plaintiffs' argument misconstrues the meaning of § (b)(5).

Section (b)(5) pertains to trust responsibilities over the settlement funds and provides for the automatic stripping of trust responsibilities "[a]s the fund ... is disbursed." But § (b)(5) is silent as to the status of lands purchased with settlement funds. Sections (b)(7) and (b)(8) simply clarify the status of lands purchased with settlement funds. Settlement lands purchased with the funds are held in trust; non-settlement lands purchased with the funds are not, and the United States shall have no further trust responsibility over them.

Thus, the Settlement Act read as a whole strongly, if not conclusively, suggests that § (b)(8) applies only to lands purchased with settlement funds ("acquired under this subsection"). While it seems to us that little, if any, ambiguity remains on that score, to the extent the statute remains ambiguous, "we will turn to other sources to divine Congress' intent." *United States v. LaPorta*, 46 F.3d 152, 156 (2d Cir.1994).

## II.

█ If the text of a statute is ambiguous, we must look to the statute as a whole and construct an interpretation that comports with its primary purpose and does not lead to anomalous or unreasonable results. *See American Tobacco Co. v. Patterson*, 456 U.S. 63, 71, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982) ("Statutes should be interpreted to avoid untenable distinctions and unreasonable results whenever possible."); *Castellano v. City of New York*, 142 F.3d 58, 67 (2d Cir.1998) ("Where the language is ambiguous, we focus upon the 'broader context' and 'primary purpose' of the statute."). We find support for our interpretation in the purpose of the Settlement Act.

The Connecticut plaintiffs characterize the Settlement Act as a "delicately balanced compromise" establishing the maximum extent to which tribal land could be removed from local control. The district court agreed, finding that

[i]t is unreasonable to suppose that the parties negotiated a settlement to include these arrangements and yet intended to allow the Secretary to take into trust for the benefit of the Tribe any and all land acquired by the Tribe in the future, as long as the land was not purchased with Settlement Fund money. *Connecticut v. Babbitt,* 26 F.Supp.2d at 406. We disagree.

■ The Settlement Act was not, as the Connecticut plaintiffs argue, a comprehensive statute intended to settle once-and-for-all the extent of the Mashantucket Pequot's sovereignty. Rather, it emerged from the specific land dispute arising out of the 1976 lawsuits filed by the Tribe. The congressional findings contained within the Settlement Act itself suggest that the purpose of the Act was more parochial than the Connecticut plaintiffs contend. The statute recites that "the pendency of [the Tribe's] lawsuit has placed a cloud on the titles to much of the land in the town of Ledyard, including lands not involved in the lawsuit, which has resulted in severe economic hardships for the residents of the town." 25 U.S.C. § 1751(b). Therefore, the Act continues, "Congress shares with the State of Connecticut and the parties to the lawsuit a desire to remove all clouds on titles resulting from such Indian land claims." *Id.* at § 1751(c). Congress saw the Settlement Act as providing the necessary federal implementation of the private agreement negotiated between the parties that would end the existing lawsuit. *See id.* at § 1751(d). Nothing in the Act indicates that Congress intended to establish the outermost boundaries of the Tribe's sovereign territory.

Our conclusion finds strong support in the Maine Indian Claims Settlement Act ("Maine Settlement Act"), 25 U.S.C. §§ 1721–35, enacted in 1980, which both parties concede was a model for the Mashantucket Pequot's Settlement Act. In marked contrast to the Settlement Act, the Maine Settlement Act has a broad provision that prevents lands not specifically covered by that Act from being taken into trust by the Secretary:

Except for the provisions of this subchapter, the United States shall have no other authority to acquire lands or natural resources in trust for the benefit of Indians . . . in the State of Maine.

25 U.S.C. § 1724(e).

Located within a statutory section entitled, in part, "other acquisition authority barred for benefit of Indians in State of Maine," this provision is plain on its face and decisively supplants the Secretary's authority to take land into trust under the 1934 IRA beyond that expressly contemplated by the Maine Settlement Act.

Plaintiffs counter with a contrasting interpretation of the Maine Settlement Act. The distinct purpose of § 1724(e), they argue, is to prohibit the Secretary from taking land into trust on behalf of any Indian tribes other than the three named in the Maine Settlement Act, whereas in Connecticut the Secretary retains the right to take land into trust on behalf of other Indian tribes.

Plaintiffs' construction of the Maine Settlement Act, while superficially plausible, is unconvincing. We have compared both statutes and find in the Maine Settlement Act an obvious demonstration that Congress knew how to prohibit the Secretary from taking into trust any lands outside of specifically designated settlement lands. The absence of an analogous provision in the Settlement Act at issue in this case confirms that the Settlement Act was not meant to eliminate the Secretary's power under the IRA to take land purchased without settlement funds into trust for the benefit of the Tribe.

Plaintiffs urge us to reject an interpretation of § (b)(8) that will create a "checkerboard" jurisdiction. The Settlement Act provides expressly that Connecticut retains civil and criminal jurisdiction over the Tribe's reservation, *see* 25 U.S.C. § 1755, while non-settlement lands taken into trust would, they argue, be immune

from state jurisdiction. The district court concluded that if the Tribe is permitted to extend its trust lands outside of the settlement lands then "the Tribe would have greater autonomy with regard to those parcels than it has within the reservation defined by the statute." *Connecticut v. Babbitt,* 26 F.Supp.2d at 407.

The plaintiffs are correct that the defendants' interpretation could result in a checkerboard jurisdiction. Of course, any success on the part of the Tribe in achieving trust status of its non-settlement lands will depend upon the ultimate outcome of administrative proceedings after the Connecticut plaintiffs' challenge thereto has been determined. In any event, the possibility of heterogeneous jurisdictional areas within the Mashantucket Pequot's lands does not compel a different result in this case. *See Washington v. Confederated Bands & Tribes of the Yakima Indian Nation,* 439 U.S. 463, 502, 99 S.Ct. 740, 58 L.Ed.2d 740 (1979) ("In short, checkerboard jurisdiction is not novel in Indian law...."). While we might question the wisdom of different jurisdictional provisions governing different trust lands, we will not provide a strained interpretation of the Settlement Act simply to avoid such a result.

### III.

■ Nothing in the Settlement Act's legislative history compels a different conclusion than the one we reach.[3] In fact, it offers us little guidance. Both parties point primarily to reports from the Senate Select Committee on Indian Affairs, S.Rep. No. 98–222, 98th Cong., 1st Sess. (1983), and the House Committee on Interior and Insular Affairs, H.R.Rep. No. 98–43, 98th Cong., 1st Sess. (1983). The plaintiffs rely on the following language that appears identically in both reports:

> Section [1754](b)(8) specifically provides that lands not falling within the definition of "settlement lands" are to be held in fee by the Mashantucket Pequot Tribe and are not to be taken in trust by the United States. It provides further that the United States shall have no trust responsibility with respect to those lands. Finally, the subsection provides that these lands will not be subject to any restraint against alienation imposed by the laws of the United States.

S. Rep. 98–222 at 14; H.R.Rep. No. 98–43 at 9. While this passage at first blush appears to support the Connecticut plaintiffs' position, in fact it simply mirrors the weakness in their textual argument. The quoted language appears in a larger section that refers generally to the settlement fund. The same committee reports limit the reach of § 1754(b) to lands purchased with settlement funds, stating that "[s]ection [1754](b) establishes the terms under which the settlement fund is to be administered." H.R. Rep. 98–43 at 7; S. Rep. 98–222 at 12. Therefore, the relevant legislative history directly dealing with subsection (b) is no less ambiguous than the statute itself. Absent additional guidance within the sparse legislative record, we are unpersuaded that Congress expressed a discernible intent that § (b)(8) limit the authority of the Secretary to take non-settlement lands into trust, other than lands acquired with settlement funds.

Turning to other aspects of the legislative history, we find only ambiguity, contradiction, and silence. For example, the House Committee emphasized the language "acquired under this subsection," stating that § (b)(7) "provides that land or

---

**3.** We note that the Settlement Act appears, in some ways, more like a private agreement between two parties than like a typical federal statute. Nevertheless, our methods of statutory interpretation remain unchanged. When called on to interpret a compact between two states that had been ratified by Congress, the Supreme Court held: "We previously have pointed out that a congressionally approved compact is both a contract and a statute, and we repeatedly have looked to legislative history and other extrinsic material when required to interpret a statute which is ambiguous." *Oklahoma v. New Mexico,* 501 U.S. 221, 235 n. 5, 111 S.Ct. 2281, 115 L.Ed.2d 207 (1991) (internal citations omitted).

natural resources *acquired pursuant to subsection [§ 1754(b)]* and located within the settlement lands" are to be taken into trust. H.R. Rep. 98–43 at 9 (emphasis added).

On the other hand, the Senate Committee found that § (b)(7) "provides that land or natural resources acquired pursuant to subsection [1754(b)] *or otherwise lawfully acquired* and located within the settlement lands" are to be held in trust, S. Rep. 98–222 at 14 (emphasis added), whereas § (b)(8) applies more generally to any "lands not falling within the definition of 'settlement lands.'" *Id.* In other words, § (b)(8), unlike § (b)(7), includes no provision referencing how the land was acquired. However, any support plaintiffs seek to garner in the Senate Committee's report, is undermined by the report's reliance elsewhere on a number of proposed amendments to the Settlement Act that were ultimately rejected. One amendment would have removed the phrase "under this subsection" from § (b)(7), so that § (b)(7) applied to all settlement lands "acquired" whereas § (b)(8) applied only to non-settlement lands "acquired under this subsection." *Id.* at 4. Accordingly, we will not place stock in a legislative history that is on-the-whole considerably more ambiguous than the statute itself.

## IV.

■ Our interpretation of § (b)(8) finds substantial additional support in the unique canon of construction governing statutory provisions involving Indians. As the Supreme Court has often reiterated, "the standard principles of statutory construction do not have their usual force in cases involving Indian law." *Montana v. Blackfeet Tribe of Indians,* 471 U.S. 759, 766, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985). "[S]tatutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *Id.*

"In determining [congressional] intent, we are cautioned to follow the general rule that doubtful expressions are to be resolved in favor of the weak and defenseless people who are the wards of the nation, dependent upon its protection and good faith." *Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584, 586, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977) (internal quotation marks and alterations omitted). As the Court explained, in one of its early formulations:

> In construing any treaty between the United States and an Indian tribe, it must always ... be borne in mind that the negotiations for the treaty are conducted, on the part of the United States, an enlightened and powerful nation, by representatives skilled in diplomacy, masters of a written language, understanding the modes and forms of creating the various technical estates known to their law, and assisted by an interpreter employed by themselves; that the treaty is drawn up by them and in their own language; that the Indians, on the other hand, are a weak and dependent people, who have no written language and are wholly unfamiliar with all the forms of legal expression, and whose only knowledge of the terms in which the treaty is framed is that imparted to them by the interpreter employed by the United States....

*Jones v. Meehan,* 175 U.S. 1, 10–11, 20 S.Ct. 1, 44 L.Ed. 49 (1899).

■ The Connecticut plaintiffs contend that the Indian canon of construction has no application in this case—not to *these* Indians—because of the Mashantucket Pequot's tremendous wealth. To be sure, the Tribe today is hardly comprised of weak and defenseless people. Indeed, the economic power and legal acumen of the Mashantucket Pequots bears no discernible resemblance to that of the Indian tribes on whose behalf the Indian canon of construction was first developed.

The fact that the Tribe today is at no practical disadvantage does not strip the Indian canon of its force. The Supreme Court has applied the canon where Indians were at no legal disadvantage. For exam-

ple, in *Oregon Department of Fish & Wildlife v. Klamath Indian Tribe,* 473 U.S. 753, 105 S.Ct. 3420, 87 L.Ed.2d 542 (1985), the Court noted that during the original negotiation of the treaty at issue in that case, "[t]he Tribe was assisted by counsel and actively asserted its interests when those interests diverged from the proposals of the United States." *Id.* at 758, 105 S.Ct. 3420. The Court nevertheless held that "doubts concerning the meaning of a treaty with an Indian tribe should be resolved in favor of the tribe." *Id.* at 766, 105 S.Ct. 3420.

Moreover, the Mashantucket Pequot's present wealth postdates the Settlement Act. At the time of enactment in 1983, the conditions of the Mashantucket Pequots were more consistent with the premise underlying the Indian canon of statutory construction. Even if we would endorse plaintiffs' view that the Indian canon of construction applies with less force to statutes or treaties negotiated with a wealthy, powerful, and well-represented Indian tribe, it has no application here.

## V.

 Finally, the deference we generally owe to an agency's interpretation of an ambiguous statute supports our view of this appeal. In cases like this one, it bears repeating that "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *accord Japan Whaling Ass'n v. American Cetacean Soc'y,* 478 U.S. 221, 233, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986). Insofar as agency deference remains appropriate in this case, it confirms our interpretation of the Settlement Act. The Department of the Interior has determined that: "Inasmuch as section 1754 relates in its entirety to the Tribe's trust fund, none of its subprovisions as set forth above govern the status of lands acquired by other means with non-trust fund monies."

The plaintiffs argue that *Chevron* deference is inappropriate in this case for two reasons: (1) because less deference is owed to agency determinations that expand an agency's jurisdiction; and (2) the agency determination in this case is not well-settled as the agency's current position represents a complete reversal of its earlier position. Both arguments lack merit.

In support of their argument that the agency is entitled to less deference if the provision in question limits agency action, plaintiffs point to our prior holding that

> Courts construing statutes enacted specifically to prohibit agency action ought to be especially careful not to allow dubious arguments advanced by the agency in behalf of its proffered construction to thwart congressional intent expressed with reasonable clarity, under the guise of deferring to agency expertise on matters of minimal ambiguity.

*Independent Ins. Agents of Am., Inc. v. Board of Governors of Fed. Reserve Sys.,* 838 F.2d 627, 632 (2d Cir.1988). The principle is inapplicable here. First, we disagree that the Settlement Act was enacted "specifically to prohibit agency action" as the plaintiffs contend. Second, we disagree that the agency's construction of the statute in this case is contrary to plainly expressed congressional intent; if it were, we would of course defer to Congress. *See Chevron,* 467 U.S. at 842–43, 104 S.Ct. 2778. Plaintiffs' argument is accordingly misplaced.

 Plaintiffs are correct that an agency interpretation at odds with an earlier position taken by the agency is entitled to less deference than we generally accord under *Chevron. See INS v. Cardoza–Fonseca,* 480 U.S. 421, 446 n. 30, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) ("An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is entitled to considerably

less deference than a consistently held agency view.") (internal quotation marks omitted); *American Mining Cong. v. EPA,* 824 F.2d 1177, 1182 (D.C.Cir.1987). The Connecticut plaintiffs point to a 1988 opinion letter from the Regional Solicitor of the Department of the Interior who indicated his view that "[l]ands located outside the 'settlement lands' must be held in fee." Two years later in 1990, but still three years prior to the trust application giving rise to the instant suit, the same Regional Solicitor reconsidered his original position and determined that the Settlement Act "does not restrict the application of [the IRA] to the Pequot Tribe."

The parties argue over whether the agency's now ten-year-old position on this matter is well-settled. We believe that it is. The Department of the Interior has provided a reasoned analysis in support of its new determination that § (b)(8) refers only to land purchased with money from the settlement fund. But even according less deference than usual, we would still take account of the agency's position. *See Rust v. Sullivan,* 500 U.S. 173, 186–87, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) (deferring to a changed agency interpretation where the agency "amply justified [its] change of interpretation with a reasoned analysis.") (citation omitted).

Motivating all of plaintiffs' arguments is their final claim that a decision today in defendants' favor would theoretically make it possible for the Secretary to take into trust virtually all of southeastern Connecticut. And indeed, we find nothing in the Settlement Act itself that would prevent such a result. But this is a policy argument better addressed to Congress; it is not a basis for arriving at a strained interpretation of the Settlement Act. Other federally recognized Indian tribes are not saddled with a geographical limit to the land that can be taken into trust by the Secretary. We see no reason to fashion a rule that limits the Tribe from seeking authorization, after administrative proceedings, to have land placed into trust

with the Secretary simply because the Mashantucket Pequots now have the purchasing power to make substantial real estate acquisitions. While we are aware of Connecticut's concern that the Tribe may pose a threat to its sovereignty, it is not our function to compensate judicially for Connecticut's or Congress's failure to provide for the Tribe's recent economic good fortune. In our view, the Connecticut plaintiffs' challenge is more appropriately presented as a challenge to the Secretary's exercise of discretion under the IRA, and in that regard we express no view.

## CONCLUSION

For the reasons set forth above, the judgment of the district court is reversed, and the case remanded for further proceedings consistent with this opinion. We have closely considered all of plaintiffs' remaining arguments and find them without merit.